GREEN BAY STRUCTURAL STEEL, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 942–68. Filed December 24, 1969.

*Richard C. Ninneman* and *Matt M. Millen*, for the petitioner.
*Robert M. Burns*, for the respondent.

TIETJENS, *Judge:* The Commissioner determined deficiencies in the Federal income tax of Green Bay Structural Steel, Inc., for the fiscal years ended June 30, 1964 and 1965, in the amounts of $6,512.76 and $6,257.74, respectively. The only issue for decision is whether or not Green Bay Structural Steel, Inc., is entitled to interest deductions on certain 5-percent subordinated notes in the amount of $12,768.75 for fiscal 1964 and 1965 under section 163, I.R.C. 1954.[1] This will in turn depend on a finding as to whether these 5-percent subordinated notes are bona fide indebtedness or are equity contributions.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation and exhibits attached thereto are incorporated herein by this reference.

Green Bay Structural Steel, Inc. (hereinafter referred to as Green Bay or petitioner), is a Wisconsin corporation with its principal office at Green Bay, Wis., on the date the petition herein was filed. Petitioner filed its Federal income tax returns for fiscal years ended June 30, 1964 and 1965, with the district director of internal revenue at Milwaukee, Wis. Green Bay follows an accrual method of accounting.

Green Bay was organized [2] on December 2, 1955, to acquire the assets of Northeastern Boiler & Welding, Ltd., a partnership, operated by Arnold and Laverne Kraft. The partnership, although in bankruptcy, was operating at a profit; however, attempts to use creditor plans to reorganize it failed due to the unwillingness of a principal creditor to cooperate.

For the 9-month period ending September 30, 1955, financial statements revealed a net worth of $512,353.50 and a net operating profit of

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise specified.

[2] The petitioner was originally incorporated under the name Northeastern Boiler & Welding, Ltd., a corporation. The corporate name was changed to Green Bay Structural Steel, Inc., on Jan. 15, 1960.

$135,437.29. It had been decided by the bankruptcy court to sell the assets of the partnership at auction. The Krafts' attorney and some friends who desired to aid the Krafts to the end of keeping the business in Green Bay, with the Krafts eventually reacquiring ownership, discussed the possibility of forming a corporation to acquire the assets of the partnership from the trustee in bankruptcy. This group numbered 24. Of these, 3 had themselves gone through some form of receivership and thereafter had become quite successful. Aside from their altruistic desires, these men were also interested in adequate security and a commercial return for any investment they might make. The Krafts' attorney suggested a capital structure of stock and debentures in the amounts of $75,000 and $225,000 respectively, which was agreed to. At this time the Krafts were burdened with large personal obligations, which would require some time to clear up and hence any reacquisition by them would not be immediate. It was estimated that approximately $500,000 was to be bid at the auction for the partnership's assets. A temporary loan of $250,000 had been authorized to help with the initial financing by the Marine National Exchange Bank. However, before any money under the loan agreement could be available, subscriptions for the $300,000 of securities had to be paid in and such payment had to be satisfactorily proved to the bank. Should the bid exceed $500,000, petitioner was to obtain additional subscriptions payable in cash to cover any excess. Furthermore, the petitioner had to establish that the capital stock was fully paid and nonassessable, that the debentures were validly authorized, issued, and outstanding and were in all respects subordinated to the debt to the bank.

It was felt by the group interested in the purchase that the assets were worth at least their book value and perhaps $250,000 to $300,000 more.[3] The trustee in bankruptcy conservatively estimated that the earning potential of petitioner was between $75,000 and $100,000 a year. The petitioner made a successful bid at the auction of $518,750 which after some adjustments resulted in a net payment of $498,406.49. A target or base bid or upset price of $350,000 for the assets had been set, based on a previous offer received by the trustee approximately 6 months earlier.

Petitioner issued 16,025 shares of stock (value $80,125) to the 24 organizers of the corporation and in direct proportion thereto, i.e., 3

---

[3] The assets that were eventually purchased at auction were carried on the books of the trustee as follows:

| | |
|---|---:|
| Work in process | $165,120.49 |
| Raw material | 303,948.34 |
| Fixed assets | 256,706.85 |
| Customer advances | (23,751.99) |
| Advance on purchases | 18,588.74 |
| Total | 720,612.43 |

for 1, issued $240,375 of 5-percent subordinated notes, due December 31, 1965. The notes in part provided:

### SUBORDINATION

Anything in this Note to the contrary notwithstanding, the indebtedness evidenced by this Note shall be subordinate and junior in right of payment, to the extent and in the manner hereinafter set forth, to all indebtedness of the Company both secured and unsecured, whether outstanding at the date of this Note or incurred after the date of this Note, (such indebtedness of the Company to which the Notes are subordinate and junior being sometimes hereinafter referred to as "Prior Debt"):

(i) In the event of any insolvency or bankruptcy proceedings, and any receivership, liquidation, reorganization or other similar proceedings in connection therewith, relative to the Company or to its creditors, as such, or to its property, and in the event of any proceedings for voluntary liquidation, dissolution or other winding up of the Company, whether or not involving insolvency or bankruptcy, then the holders of Prior Debt shall be entitled to receive payment in full of all principal and interest on all Prior Debt before the holders of the Notes are entitled to receive any payment on account of principal or interest upon the Notes, and to that end (but subject to the power of a court of competent jurisdiction to make other equitable provision reflecting the rights conferred in this Note upon the Prior Debt and the holders thereof with respect to the subordinate indebtedness represented hereby and the holder thereof by a lawful plan of reorganization under applicable bankruptcy law) the holders of Prior Debt shall be entitled to receive for application in payment thereof any payment or distribution of any kind or character, whether in cash or property or securities, which may be payable or deliverable in any such proceedings in respect of the Notes, except securities which are subordinate and junior in right of payment to the payment of all Prior Debt then outstanding; and

(ii) In the event of any default in the payment of the principal (including any sinking fund payments or required pre-payments) of or interest on any Prior Debt and during the continuation of any such default, no amount shall be paid by the Company and no Note holder shall be entitled to receive any amount, in respect to the principal of or interest on any Note.

(iii) In the event that any Note is declared due and payable before its expressed maturity because of the occurrence of a default hereunder (under circumstances when the provisions of the foregoing Clause (i) shall not be applicable), the holders of the Prior Debt outstanding at the time such Note so becomes due and payable because of such occurrence of a default hereunder shall be entitled to receive payment in full of all principal and interest on all Prior Debt before the holders of the Notes are entitled to receive any payment on account of the principal or interest upon the Notes.

No present or future holder of Prior Debt shall be prejudiced in his right to enforce subordination of the Notes by any act or failure to act on the part of the Company. The provisions of this Section entitled "Subordination" are solely for the purpose of defining the relative rights of the holders of Prior Debt on the one hand, and the holders of the Notes on the other hand, and nothing herein shall impair, as between the Company and the holder of any Note, the obligation of the Company, which is unconditional and absolute, to pay to the holder thereof the principal, premium, if any, and interest thereon in accordance with its terms, nor shall anything herein prevent the holder of a Note from exercising all reme-

dies otherwise permitted by applicable law or hereunder upon default hereunder, subject to the rights, if any, under this Section entitled "Subordination" of holders of Prior Debt to receive cash, property or securities otherwise payable or deliverable to the holders of the Notes.

The Company agrees, for the benefit of the holders of Prior Debt, that in the event that any Note is declared due and payable before its expressed maturity because of the occurrence of a default hereunder (a) the Company will give prompt notice in writing of such happening to the holders of Prior Debt and (b) all Prior Debt shall forthwith become immediately due and payable upon demand, regardless of the expressed maturity thereof.

### DEFAULTS

The unpaid principal hereof together with all interest accrued or unpaid thereon, shall, at the option of the holder or holders of this Note and without, presentment, demand or notice, which are hereby waived, become immediately due and payable in the event of the happening of any of the following events of Default:

(a) Default shall be made in the payment of the principal of the Note when the same shall become due and payable by lapse of time, by call for redemption or otherwise,

(b) Default shall be made in the payment of interest on the Note when the same shall become payable as herein provided and such default shall continue for a period of thirty (30) days.

(c) Default shall be made in the observance or performance of any of the other convenants, conditions, provisions or obligations in this Note expressed and the Company shall not remedy such default or make good such convenant within thirty (30) days after a written notice so to do shall have been served upon the Company by the holder of any of the Notes.

(d) The Company shall be adjudicated a bankrupt or a decree or order approving as properly filed a petition or answer asking reorganization of the Company under the Federal Bankruptcy laws, as now or hereafter amended, or the laws of any state, shall be entered, and any such decree or judgment or order shall not have been vacated or stayed or set aside within thirty (30) days from the date of the entry or granting thereof; or

(e) The Company shall file, or admit the jurisdiction of the Court and the material allegations contained in, any petition in bankruptcy or any petition pursuant, or purporting to be pursuant, to any present or future acts of Congress on the subject of bankruptcies or any amendments to such acts, or the Company shall institute any proceedings, or the Company shall give its consent to the institution of any proceedings, for any relief of the Company under any bankruptcy or insolvency laws, or any laws relating to the relief of debtors, readjustment of indebtedness, reorganizations, arrangements, compositions or extensions; or

(f) The Company shall make any assignment for the benefit of creditors or shall apply for a consent to the appointment of a receiver for the Company or any of the property of the Company; or

(g) A decree or order appointing a receiver of the property of the Company shall be made and such decree or order shall not have been vacated, stayed, or set aside within thirty (30) days from the date of the entry or granting thereof.

The term of the notes was selected at 10 years in order to allow petitioner adequate opportunity to retire the notes out of earnings or the

sale of excess land. The subordination feature was inserted to enable the corporation to negotiate any needed future financing. The default provisions were inserted to assure investors a means to enforce payment should a default occur. Between 1956 and June 1965 there had been two defaults on interest payment. The interest due June 15, 1961, was paid July 28, 1961, and the interest due June 15, 1960, was paid on December 22, 1960. This latter delay was due to heavy commitments by petitioner on both payroll and materials. During both of these delays, the default provisions of the notes were not exercised. No sinking fund or reserve was set up to provide for repayment of the notes nor did the notes contain any restrictions on dividend payments. During this same period, the stock and/or the notes were held by 41 individuals and there were 8 noteholders who did not own stock on a prorata basis.

Transactions in land owned by petitioner that was acquired at the auction revealed that it was worth considerably more than its book value. For instance, from a tract of 70 acres that was carried by the trustee at about $840 per acre and by petitioner at about $510 per acre, a sale in 1962 of 60 acres was made at $4,000 per acre.

Arnold Kraft was retained as general manager and executive vice president of petitioner since none of the other officers or directors, who were all original shareholders, were familiar with the business. Arnold was employed for 3 or 4 years during, which the petitioner incurred a $350,000 after-tax loss on a contract entered into by Arnold. Finally Arnold's employment was terminated and on or about November 5, 1959, petitioner hired Herbert C. Holtz as president and general manager. This employment lasted until approximately September 29, 1961. During this time, Holtz was president of one of petitioner's competitors. To show his good faith, Holtz was requested to invest in petitioner. He was issued 1,000 shares of stock and $15,000 of subordinated notes, on November 5, 1959. This package was the same 3–1 notes for stock as had been received by the original 24 investors. When he left petitioner's employ, he sold his securities to other shareholders.

The 5-percent notes became due on December 31, 1965. During the period July 1, 1965, through December 31, 1965, $234,925 of the $255,375 [4] of the 5-percent notes outstanding as of June 30, 1965, were refinanced with 5-year, 6-percent notes containing substantially the same provisions as the original 5-percent notes.

On its Federal income tax returns for fiscal 1964 and 1965, petitioner deducted $12,768.75 as interest paid on the 5-percent notes. In his notice of deficiency the Commissioner disallowed the deductions "because it has not been established that such amounts * * * represented interest on a bona fide indebtedness."

---

[4] $240,375 originally issued plus $15,000 issued to Herbert Holtz in 1959.

OPINION

We must decide if the 5-percent subordinated notes were in fact bona fide indebtedness thereby entitling Green Bay to an interest deduction under section 163, I.R.C. 1954. In this area of debt versus equity precedent is of little value. Each case depends for its solution upon its own set of facts. *Gooding Amusement Co.* v. *Commissioner*, 236 F. 2d 159 (C.A. 6, 1956), affirming 23 T.C. 408, certiorari denied 352 U.S. 1031.

Many factors bearing on this question have been enumerated in the decisions. After considering them in the light of the facts herein, we hold that the 5-percent subordinated notes were bona fide indebtedness and the Commissioner's disallowance of the claimed interest deductions cannot stand.

What follows is a discussion of the factors which were considered in arriving at our decision herein.

1. *Intent of the Parties.*—The intent of the parties is evidenced by the debt instrument. On its face, it leaves no room for ambiguity, it purports to be a debt instrument. However, this will not be conclusive if the attendant circumstances are to the contrary. *Kraft Foods Co.* v. *Commissioner*, 232 F. 2d 118 (C.A. 2, 1956), reversing 21 T.C. 513.

2. *Identity Between Creditors and Shareholders.*—Petitioner's initial financing was achieved by a combination bank loan and securities arrangement. The securities were issued in a package, i.e., 3 for 1, notes to stock. As of June 30, 1966, there had been many previous transfers of the securities, so that only 10 of the original 24 investors held securities, and only 4 retained prorata interests. Of the 29 security holders at this time, 7 owned no notes and only 10 held stock and notes on a prorata basis. Although it appears that some of these new investors were related to some of the original investors, we do not find a continued prorata securities holding to exist which would be a factor weighing in favor of a capital contribution rather than debt.

3. *Participation in Management by the Holder of the Instrument.*—Each original shareholder-noteholder was an officer of the corporation, but this was necessary for compliance with State law on securities registration. None of the investors was knowledgeable in the steel business nor did any of them actively participate in management.

4. *Thinness of the Capital Structure in Relation to Debt.*—On a book value basis, the initial debt-equity ratio is 5–1; $418,281 debt and $80,125 of equity. This is not inordinately high and as petitioner points out, real values should be employed when possible and on such a basis, the debt-equity ratio would fall below the 5–1 book value ratio, since the assets were considered undervalued by $250,000 to $300,000.

5. *The Risk Involved.*—Petitioner acquired the assets of a bankrupt partnership which was then earning a substantial profit and was thought to be capable of earning at least $75,000–$100,000 a year. Further, the assets were considerably undervalued. It appears to us that the risk was not any greater than for an investment in an enterprise not beset by financial difficulties.

6. *Relative Position of the Obligees as to Other Creditors Regarding the Payment of Interest and Principal.*—The subordinated notes were junior to all other indebtedness of petitioner, both secured and unsecured, whether outstanding at the date of the note, or incurred thereafter. In event of default in payment of principal or interest, petitioner was required to give notice to all the holders of such other indebtedness, which in turn would become immediately due and payable on demand, regardless of the expressed maturity thereof.

The Commissioner contends that by virtue of the subordination provision, the noteholders are in the same position as preferred stockholders. Such a line of reasoning seems to condemn all subordination. We cannot subscribe to such a position. "Subordination is not condemned but is an approved business practice." *United States* v. *Snyder Brothers Co.*, 367 F.2d 980, 989 (C.A. 5, 1966) (dissenting opinion), reversing and remanding an unreported District Court decision, certiorari denied 386 U.S. 956. We can find nothing objectionable to subordination when it is dictated by the circumstances as here.

It is to be noted that the default provisions were not invoked at either time interest was not paid when due, since the inability to meet the obligation was due to temporary cash shortages because of heavy payroll and material commitments. This does not seem to us to be a ground for invoking the default provisons, when payment was to be forthcoming.

7. *Maturity Date and Fixed Interest.*—There was both a fixed maturity date and a fixed rate of interest. However, when the notes became due, they were refinanced. The Commissioner contends that the refinancing is a factor weighing against a finding of indebtedness since the net reduction in the total debt outstanding was only $5,450 or 2.5 percent. However, we do not think the Commissioner is empowered to determine or rework the financial structure of a corporation which is valid at its inception as we conclude petitioner's was.

We conclude that petitioner's choice of financing arrangements under the circumstances of its emerging from bankruptcy was reasonable. Given this finding, we do not see how refinancing the notes with similar instruments changes the bona fides. Refinancing to the best of our knowledge is an accepted business practice and we see nothing wrong with it if reasonable in the context of the particular facts and we find such practice reasonable here.

In addition there was no sinking fund or reserve set up for repayment. The interest was to be obtained through earnings, but the notes contained no restrictions on dividend payments. We see nothing objectionable about payment of interest through earnings when the projected earnings are substantial and there are adequate assets to act as a reserve. Petitioner had earnings forecast of $75,000–$100,000 per year and was carrying on its books assets which were considerably undervalued due to their method of acquisition.

8. *Redemption by Corporation.*—There is no such provision, however, the notes were redeemed prior to maturity and replaced by a new issue.

9. *Business Purpose.*—Petitioner was organized to rescue and financially rehabilitate the Kraft brothers, to keep the business within the community and avoid its liquidation. These motives, we feel are legitimate. The initial capital structure of debt to equity, viewed with a desire to allow the Krafts to reacquire the business, was justified. After the Krafts were no longer associated with petitioner, Herbert Holtz was retained as president and general manager. His investment in petitioner was made in the same 3–1 debt-equity proportion as had been made by the original investors. We fail to see why such an investment package was necessary from a financial point of view after the Krafts were no longer able to reacquire the business and since there is no evidence showing that petitioner needed additional loans at the time Holtz was hired by Green Bay. However, this may be explained by the fact that Holtz was at that time president of one of petitioner's competitors and the investment package was a way of extracting Holtz's best efforts for petitioner.

10. *Ability of the Corporation to Obtain Outside Funds.*—Outside funds were available as evidenced by the Marine National Exchange Bank loan. The conditions attached thereto resulting in subordination do not seem unusual for a borrower just emerging from bankruptcy, and we do not feel that this shows an unavailability of outside funds as the Commissioner would have us believe.

Having considered all the relevant factors, we find the 5-percent subordinated notes to be bona fide indebtedness. We do not have here a situation of repeated advances by stockholders to the corporation to keep it going. Rather, we have a single input of funds for initial financing dictated by the circumstances surrounding and motivating incorporation. We find nothing to indicate that the notes were covering the withdrawal of what should be labeled dividends.

We therefore reverse the Commissioner's disallowance of the claimed interest deductions.

*Decision will be entered under Rule 50*