Fischer Bros. Aviation, Inc. v. Commissioner. GCS Air Service, Inc. v. Commissioner.
Fischer Bros. Aviation, Inc. v. Commissioner
Docket Nos. 4562-69, 4563-69.
United States Tax Court
T.C. Memo 1971-315; 1971 Tax Ct. Memo LEXIS 17; 30 T.C.M. (CCH) 1351; T.C.M. (RIA) 71315; December 16, 1971, Filed. Philip S. Hesby, 342 Harding Way West, P.O. Box 706, Galion, Ohio, for the petitioners. J. Edward Friedland, for the respondent. 1352 TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined deficiencies in petitioners' income taxes as follows: Docket No.
Taxable year ended
Deficiency
4562-69
December 31, 1966
$2,064.02
4563-69
December 31, 1964
264.00 The only issue for decision is whether or not the corporations involved herein are entitled to interest deductions under section 163[1] for payments made on certain notes issued at the time of *18 incorporation to their two equal stockholders. This will, in turn, depend on a finding as to whether these notes represent bona fide corporate indebtedness or capital contributions on the part of the stockholders. Findings of Fact Some of the facts have been stipulated. The stipulations, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners, Fischer Bros. Aviation, Inc., (hereinafter referred to as Aviation) and GCS Air Service, Inc. (hereinafter referred to as GCS) are corporations duly organized under the laws of the State of Ohio, having their principal places of business in Galion, Ohio, at the time of filling their respective petitions herein. Aviation filed its corporate income tax return for the calendar year 1966 with the district director of internal revenue, Cleveland, Ohio. GCS filed its corporate income tax return for the calendar year 1964 with the district director of internal revenue, Cleveland, Ohio. Montford R. Fischer, Jr. (hereinafter referred to as Montford) and William R. Fischer (hereinafter referred *19 to as William) are brothers. Prior to July 1, 1963, they were partners, each owning a 50-percent interest in the partnership Fischer Bros. Aviation, which was engaged in the following activities: (a) Operation of an airport; (b) Aircraft, passenger, and charter services; and (c) Sales, leasing, and maintenance of aircraft. In order to limit their personal liability, they decided to incorporate the operations of the partnership. Aviation was incorporated on July 1, 1963, to engage in the sales, leasing, and maintenance of aircraft, at which time all of the assets of the partnership pertaining to these activities were transferred to it. The following schedule reflects the book value of the assets transferred to Aviation (no liabilities were assumed): 1. Cash
$ 3,500.00
2. Inventory - airplanes for resale, parts for planes, gas and oil
44,661.07
3. Shop Equipment (less deprecia- tion)
1,755.87
4. Airplanes for lease 10,596.72
Total $60,513.66 In exchange for the assets transferred to Aviation, Montford and William each received the following: (a) 50 shares of common stock in Aviation with a stated value of $150.00 per share, aggregating $7,500.00; *20 and (b) Three documents dated July 1, 1963, purporting to be 6-percent notes, unsecured, due on June 30, 1973 in the amounts of $10,000.00, $10,000.00, and $2,756.83, respectively. GCS was incorporated on December 2, 1963, to engage in air freight, passenger, and charter services and the operation of an airport. At the time of incorporation, all the remaining assets of the partnership which pertained to those activities were transferred to it. The following is a schedule of transferred assets (listed at book value) and liabilities assumed on the date of transfer: ASSETS
Cash
$ 9,388.51
Accounts receivable
23,328.07
Notes receivable
1,200.00
Life insurance
7,055.00
Fixed assets Land
600.00
Buildings (less deprecia- tion)
30,476.63
Office furniture and fix- tures (less depreciation)
359.06
Automotive equipment (less depreciation)
2,947.79
Banner equipment (less depreciation) 537.98
$75,893.04
LIABILITIES
Accounts payable
$27,622.30
Notes payable bank 13,541.87
41,164.17
NET ASSETS TRANSFERRED $34,728.87 1353 In exchange for the assets transferred to GCS, Montford and William each received the following: (a) 50 shares *21 of common stock in GCS with a stated value of $150.00 per share, aggregating $7,500.00; (b) One document dated December 2, 1963, purporting to be a 6-percent note, unsecured, in the amount of $10,000.00, payable on December 1, 1973; and (c) One document purporting to be a note, unsecured, in the amount of $164.43, payable on demand. No sinking fund was required under the terms of any of the above-described documents and none has been set up by Aviation or GCS to retire the obligations evidenced thereby upon maturity. On January 2, 1964, Montford transferred the two purported notes he had received from Aviation, each in the face amount of $10,000, and the purported note he had received from GCS in the face amount of $10,000 to an irrevocable trust for the benefit of his three children. Said trust was to terminate in ten years and one day from the date of its creation, corpus reverting to Montford. On January 2, 1964, William transferred the two purported notes he had received from Aviation, each in the face amount of $10,000, and the purported note he had received from GCS in the face amount of $10,000 to an irrevocable trust for the benefit of three of his children. Said *22 trust was to terminate in ten years and one day from the date of its creation, corpus reverting to William. On January 3, 1966, William transferred the purported note, previously referred to, in the amount of $2,756.83, to an irrevocable trust for the benefit of one of his children. Said trust was to terminate on December 31, 1982, at which time the corpus was to be returned to William. With the exception of the purported demand notes in the amount of $164.43 which were satisfied in 1964, no part of the principal of the purported notes payable to Montford or William had been paid to the date of trial herein. Purported interest payments have been made regularly in accordance with the terms thereof. On November 25, 1963, Aviation borrowed $10,000 from Montford's mother-in-law, issuing, in exchange therefor, a note, unsecured, in the face amount of $10,000, bearing interest at 6 percent, payable at $125 per month. Aviation has made regular monthly payments on this note, and the outstanding balance as of March 1971 was approximately $2,000. Proceeds of the note were used for the purchase of an airplane. On March 18, 1964, Aviation borrowed the sum of $15,000 from GCS, issuing a *23 demand note in exchange therefor in the amount of $15,000, bearing interest at the rate of 6 percent per annum. A payment on this note was made in October of 1964 and the note was fully paid in December of 1964. From time to time, Aviation obtained five-year term secured loans with fixed rates of monthly payments, inclusive of both principal and interest, from the Citizens Bank of Shelby, Shelby, Ohio, and ninety-day unsecured loans at 6 percent interest from the First National Bank of Galion, Galion, Ohio. [2] The bulk of these loans was made in the years 1967 to 1970. Payments on these loans were made as due. GCS obtained one 90-day loan in 1966 and one 90-day loan and a two-year term loan in 1970 from the First National Bank of Galion, Ohio. Payments were made on these loans as due. The partnership's net profit, as reflected on its tax returns, for each of the four years immediately preceding the formation of the two corporations involved herein was as follows: Year
Amount
1960
$46,458.80
1961
36,921.76
1962
50,638.75
1963
49,937.84
Aviation and GCS had earned surplus at the end *24 of each of the years 1963 to 1969, inclusive, in the following approximate amounts: Year
Aviation
GCS
1963
0
$ 4,000
1964
$ 5,000
17,000
1965
13,000
49,000
1966
40,000
87,000
1967
43,000
91,000
1968
42,000
118,000
1969
6,000
145,000
Aviation and GCS paid cash dividends during the period 1963 through 1969 in the following amounts: 1354 Year
Aviation
GCS
1963
0
0
1964
$ 100
$ 100
1965
100
500
1966
1,000
1,000
1967
0
0
1968
1,000
1,500
1969
0
0
Ultimate Findings of Fact The notes issued upon incorporation by Aviation and GCS to Montford and William reflect bona fide corporate indebtedness. The payments in question, made by petitioners in accordance with the terms of such notes, constitute interest paid on indebtedness. Opinion The sole disputed question herein is whether certain notes issued at the time of incorporation of petitioners reflect bona fide indebtedness, thereby entitling petitioners to interest deductions under section 163. The decided cases look to the economic reality of the underlying transaction and often adopt a variety of tests and criteria in resolving this issue. *25 In the final analysis, however, the answer depends upon the particular facts and circumstances of each case, with the taxpayer bearing the burden of proof. Gooding Amusement Co. v. Commissioner, 236 F. 2d 159, 165 (C.A. 6, 1956); Anthony Mennuto, 56 T.C. 910 (1971); Rule 32, Tax Court Rules of Practice.As our ultimate findings of fact reveal, we have concluded that petitioners have carried their burden of proof. Our conclusion is based upon our analysis and evaluation of the record as a whole; we set forth only those facta probantia which we deem minimally necessary for an understanding of that conclusion. [3]
*26 The notes in question had a fixed maturity date and fixed rate of interest. Anthony Mennuto, supra; John W. Walter, Inc., 23 T.C. 550 (1954). The interest payments called for under the terms of the notes were regularly made. The notes were not subordinated to the claims of other creditors. Baker Commodities, Inc., 48 T.C. 374, 399 (1967), affirmed on another issue, 415 F. 2d 519 (C.A. 9, 1969). To be sure, they were unsecured, whereas the larger loans from banks for periods exceeding 90 days were secured. But it is not without significance that the bulk of the bank loans came long after the taxable years in question in order to meet increased business needs. Moreover, petitioners obtained a sizeable number of unsecured bank loans and there is not the slightest suggestion that the banks ever requested subordination. If the banks had though that the businesses of the two petitioners were lacking in economic viability, it is likely that they would have demanded subordination in order to protect their loans. The fact that the notes in question had 10-year terms is not conclusive against petitioners. Such a term is not unduly *27 long, given the anticipated need for business expansion. Furthermore, the initial debt-equity ratio of each petitioner has satisfied us that neither corporation was undercapitalized, an element which, while not determinative, does have a bearing upon the determination as to whether bona fide indebtedness existed. Compare Green Bay Structural Steel, Inc., 53 T.C. 451, 456 (1969). In this connection, we note that the predecessor partnership had a proven record of financial success and, while it may be true that this was in large part due to the energetic personal efforts of William and Montford, such success indicates at least some going-concern value to be taken into account. Murphy Logging Co. v. United States, 378 F. 2d 222, 224 (C.A. 9, 1967); George A. Nye, 50 T.C. 203, 215 (1968). Each corporation at its inception could look forward to profitable operations. This fact buttresses our conclusion that there was a reasonable expectation that the notes in question would be paid. Liflans Corporation v. United States, 390 F. 2d 965, 970 (Ct. Cl. 1968); Anthony Mennuto, supra; C.M. Gooch Lumber Sales Co., 49 T.C. 649, 656 (1968). *28 We are not impressed with respondent's argument that the absence of a clearly articulated basis for the allocation of the values of the assets exchanged between the 1355 notes and the stock and the transfer of the notes to the trusts indicates that only tax avoidance motivated the creation of the notes herein. We fail to see how either of these considerations necessarily requires that we hold against petitioners. At best, they are elements to be taken into account in determining the economic reality of the underlying transactions. But if that reality exists, they fall by the wayside. See United States v. Hertwig, 398 F. 2d 452, 455 (C.A. 5, 1968); cf. Rowan v. United States, 219 F. 2d 51, 54 (C.A. 5, 1955). See also, Plumb, "The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal," 26 Tax L. Rev. 369, 538-542 (1971). While the matter is not entirely free from doubt, we have concluded, on the basis of the entire record before us, that the requisite economic reality exists to justify the conclusion that the notes in question represent bona fide indebtedness. If we were to allow the respondent "to determine *29 or rework the financial structure[s]" of Aviation and GCS under these circumstances (see Green Bay Structural Steel, Inc., supra, 53 T.C. at 457), we would be substituting our business judgment for that of petitioners. This we are not prepared to do. Anthony Mennuto, supra; Malone &e Hyde, Inc., 49 T.C. 575, 579 (1968). Decisions will be entered for the petitioners. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise specified.↩
2. Commencing in 1969, the interest rate rose to 6 1/2 percent.↩
3. For an exhaustive analysis of the numerous considerations involved in resolving a debtequity issue, see Plumb, "The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal," 26 Tax L. Rev. 369↩ (1971). We note that section 385, added by the Tax Reform Act of 1969, delegates to the Treasury broad authorization to establish, by regulations, standards for distinguishing stock from indebtedness for all purposes of the Internal Revenue Code. See S. Rept. No. 91-552, 91st Cong., 1st Sess., pp. 138-139 (1969).