ESTATE OF CALVIN HOSMER, DECEASED, MANATEE NATIONAL BANK OF BRADENTON, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Hosmer v. Commissioner
Docket No. 1399-70.
United States Tax Court
T.C. Memo 1973-22; 1973 Tax Ct. Memo LEXIS 263; 32 T.C.M. (CCH) 77; T.C.M. (RIA) 73022; February 1, 1973, Filed *263 Gregory J. Porges, for the petitioner. Donald W. Williamson, Jr., for the respondent. FAY. MEMORANDUM OPINION FAY, Judge: Respondent determined the following deficiencies in Federal income tax of Calvin Hosmer, Sr., deceased (hereinafter referred to as the decedent-taxpayer): Year
Deficiency 1963
$2,229.44
1964
3,726.75
1965
2,958.41
1966
2,915.03
1967
3,282.79 2 The only issue for decision is whether certain advances by decedent-taxpayer to York Flour Mills, Inc. (also known as York Roller Mills and hereinafter referred to as York), constituted bona fide indebtedness or a combination of bona fide indebtedness and contributions to equity capital. All of the facts have been stipulated; the stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Decedent-taxpayer died on June 13, 1968. Letters Testamentary issued June 14, 1968, designated the Manatee National Bank of Bradenton, Florida, as executor and personal representative. The legal business location of the Manatee National Bank on March 9, 1970, the date of the filing of the petition in the instant case, was Bradenton, Florida. *264 The estate of decedent-taxpayer is the petitioner in the case at bar and will hereafter be referred to as petitioner. Decedent-taxpayer filed his Federal income tax returns for the taxable years 1963 through 1967 with the district director of internal revenue for the districts shown as follows: Taxable Year
District Director's Office
1963
Augusta, Maine
1964
Augusta, Maine
1965
Augusta, Maine
1966
Jacksonville, Florida
1967
Jacksonville, Florida
York was formed and incorporated in May 1928, with an authorized capital of 1,500 shares of common stock with a par value of $2 per share and 1,500 shares of preferred stock with a par 3 value of $100 per share. As of December 31, 1957, York's stock was held as follows: Stockholder
Shares of Common
Shares of Preferred Calvin Hosmer, Sr.
275
220
Joseph Weidemann
250
200
F. G. Updegrove
150
120
Calvin Hosmer, Jr.
25
20
Treasury stock
300
440
Total
1,000
1,000
Decedent-taxpayer owned or controlled 300 of 700 shares (i.e., 42.9 percent) of the outstanding common stock of York from 1928 through the years in issue. The operation of York has been fairly conservative *265 between the years 1928 and 1957 and its directors had considered several times the possibility of selling the mill property, but did not do so. It became apparent in 1957 that some action was required with respect to York's future management and operation. The principal shareholders were of advanced age - i.e., decedent-taxpayer was 81, Joseph Weidemann was 71, and F. G. Updegrove was 70. In addition, Joseph Weidemann was in ill health and the relationship between the two Hosmers was not good due to personal differences.Moreover, decedent-taxpayer wanted to expand and improve the mill, and F. G. Updegrove wanted to sell it. In December 1957, decedent-taxpayer met with Phillip M. Spalding ("Spalding"), who had been employed by General Mills 4 for 10 years and was involved in the selling of flour for that company. Decedent-taxpayer and Spalding discussed the possibility of Spalding's becoming York's manager. By letter agreement dated May 7, 1958, York's directors and shareholders entered into an employment contract with Spalding. This contract enumerated Spalding's duties and remuneration and the terms of a stock option in his favor to acquire common stock of York. In *266 June 1958, Spalding began working for York and was subsequently elected a director and president of York. F. G. Updegrove was elected vice-president of York. Joseph Weidemann died on October 3, 1958. Spalding thereafter exercised his option to purchase common stock by purchasing the 250 shares of York common stock owned by Weidemann. Upon his arrival at York, Spalding discovered that York's physical plant and facilities were in generally poor condition. Decedent-taxpayer and Spalding corresponded frequently after Spalding assumed his responsibilities at York. During this correspondence, both men indicated their concurrence with the need for modernization and expansion of York. Moreover, decedent-taxpayer indicated several times in this correspondence that he would be willing to loan money to York to facilitate York's modernization and expansion program. In March 1960, Spalding purchased an additional 140 shares 5 of York common stock from F. G. Updegrove. As a result of this purchase, Spalding owned a majority (i.e., 55.7 percent) of York's outstanding common stock. During the period of Spalding's initial association with York and subsequent to Joseph Weidemann's *267 death, York's preferred stock began to be dispersed among a wider group of people, none of whom was active in York's operations. Upon Joseph Weidemann's death, for example, his 200 shares of York preferred stock were divided equally among his four children. Moreover, decedent-taxpayer, in anticipation of York's issuance of 25-year 5 percent debentures in exchange for the York preferred stock, disposed of his 220 shares of York preferred stock by giving 110 shares to John and Ruth Hosmer and 110 shares to Richard and Caroline Hosmer. At the annual meeting of York's stockholders held on March 23, 1959, the stockholders voted to amend the corporate charter to provide for the issuance of 25-year 5 percent debentures for the purpose of retiring York's outstanding preferred stock and for capital expansion. The stockholders also voted to investigate mortgaging the mill to finance York's modernization and expansion program. At the annual meeting of York's stockholders held on March 23, 1960, the resolution of March 23, 1959, authorizing the 25-year 5 percent debentures was revoked and the directors were instead authorized to offer notes bearing interest at the 6 rate of 5 percent *268 per annum. York's accountant recommended that the following form of note should be used: FORM OF NOTE YORK ROLLER MILLS COMPANY
The York Roller Mills Company agrees to pay to the sum of at 5% per annum, in payment of number of shares of the Preferred Stock of said Company, turned in this day. It is agreed that the Company will reduce this Note to the best of it's ability, when and as working capital permits, and said reductions shall be made pro rata to the total outstanding unpaid balances of this issue of Notes. These Notes, however, are subrogated to bank loans in the event of liquidation. ate YORK ROLLER MILLS COMPANY
Prior to the issuance of the notes in exchange for the preferred stock, Spalding took the form of the note recommended by York's accountant to Garnet L. Rife ("Rife"), executive vice-president of the York Bank & Trust Co., for Rife's consideration. Rife reviewed the format of the note and submitted it to his bank's correspondent bank in Philadelphia, which sometimes participated in loans to York. Upon Rife's recommendation, which was concurred in by the correspondent bank in Philadelphia, the form of the note was slightly revised to provide for complete *269 subordination of the notes to bank loans. The revised form of note contained the following language: FORM OF NOTE YORK ROLLER MILLS COMPANY
The York Roller Mills Company agrees to pay to the sum of at 5% per annum, in payment of number of shares of the Preferred Stock of said Company, turned in this day. It is agreed that the Company will reduce this Note to the best of it's ability, when and as working capital 7 permits and said reductions shall be made pro rata to the total outstanding unpaid balances of this issue of Notes. These Notes, however, are subordinated to bank loans. Date YORK ROLLER MILLS COMPANY
The revised note was then offered in exchange for the preferred stock and by November 1960 all of the preferred stock had been exchanged for the notes. In 1959 Joseph Weidemann, Jr., arranged for York to redeem his 50 shares of preferred stock which were distributed to him by his father's estate in September 1959. In 1960, Calvin Hosmer, Jr., sold his 20 shares of preferred stock to York; John and Ruth Hosmer exchanged their 110 shares of preferred stock for York's note in the principal amount of $11,000; Richard and Caroline Hosmer exchanged their 110 shares *270 of preferred stock for York's note in the principal amount of $11,000; and decedent-taxpayer exchanged 170 shares of preferred stock which he had purchased from F. G. Updegrove for York's note in the principal amount of $17,000. The three remaining Weidemann heirs finally consented in November 1960 to exchange their 150 shares of preferred stock for York's notes totalling $15,000. During his correspondence with Spalding, decedent-taxpayer actively encouraged Spalding to proceed with the modernization and expansion of York. Due to uncertainties as to the best method for financing the modernization and expansion program, York's board of directors held a meeting on 8 December 11, 1961, to resolve this problem.The directors decided to spend $100,000 on new equipment and authorized the sale of $100,000 of preferred stock to decedent-taxpayer to raise the needed capital. On December 12, 1961, decedent-taxpayer paid $75,000 to York in exchange for 950 shares ($100 par value per share) of York's preferred stock. Moreover, at the time of York's issuance of these preferred shares to decedent-taxpayer, he executed a receipt for the preferred shares. This receipt also included an agreement *271 by which decedent-taxpayer consented to pay the remaining balance of $20,000 within 60 days from the date of York's issuance of the preferred stock. Decedent-taxpayer subsequently requested in a letter dated January 15, 1962, that York issue 5 percent notes to him in exchange or redemption of the preferred stock, which notes were to be the same as had been previously issued by York for the other outstanding preferred stock. On January 22, 1962, decedent-taxpayer's 950 shares of preferred stock were exchanged or redeemed for a 5 percent note in the amount of $95,000 executed by York and payable to decedent-taxpayer. On January 29, 1962, decedent-taxpayer remitted the remaining $20,000 to York. Subsequent to the exchange or redemption of decedent-taxpayer's preferred stock and the issuance of the note to him, York applied for a substantial loan from the York Bank & 9 Trust Co. The loan was approved and the Philadelphia National Bank agreed to participate in the loan. However, prior to participating in this loan, the Philadelphia National Bank required all the individuals holding notes issued by York in exchange or redemption of preferred stock to execute a formal subordination *272 agreement. This formal subordination agreement was executed by all parties, including decedent-taxpayer. The comparative balance sheet contained in York's financial report for the year ended December 31, 1962, reflected a noncurrent liability in the amount of $149,000 which was designated as notes payable to individuals. The amount of notes payable to individuals reflected in the comparative balance sheet for the year ended December 31, 1961, was $54,000, which indicates that an increase in this account of $95,000 occurred during York's taxable year 1962. The $95,000 amount reflects decedent-taxpayer's exchange or redemption of his 950 shares of preferred stock for York's $95,000 note during January 1962. York's balance sheets for the taxable years 1963 through 1965 all reflect noncurrent liabilities under the category of notes payable to individuals in amounts equal to the outstanding principal balances of the notes given in exchange for York's preferred stock, including the $95,000 note given to decedent-taxpayer. York has not paid any dividends since 1957. York's retained earnings account increased from 10 approximately $251,000 as of December 31, 1963, to approximately *273 $349,000 as of December 31, 1965.
During the years 1963 through 1967, decedent-taxpayer received payments from York which were treated by York and decedent-taxpayer as the payment of principal and interest due on the notes issued to decedent-taxpayer in exchange or redemption of his preferred stock in the following proportions: Year
Total Amount Received
Principal
Interest 1963
$16,400
$ 8,000
8,400
1964
16,920
14,400
2,520
1965
15,960
11,200
4,760
1966
15,400
11,200
4,200
1967
14,840
11,200
3,640
Decedent-taxpayer in his Federal income tax returns for the taxable years 1963 through 1967 reported as income therein only that portion of the amounts received from York which had been calculated by York and decedent-taxpayer as interest due on the notes, which amounts were as follows: Taxable Year
Interest Income Reported 1963
$8,400
1964
2,520
1965
4,760
1966
4,200
1967
3,640
On December 10, 1969, respondent issued a statutory notice wherein one-half of decedent-taxpayer's advances to York was considered as a contribution to capital and one-half was considered as the purchase of notes. This resulted in a *274 11 determination that the amounts received by decedent-taxpayer from York should have been treated as follows: Year
Total Amount Received
"Stock-Note" Collections
Dividends Received
Interest Received 1963
$16,400
4,000
$ 8,200
4,200
1964
16,920
7,200
8,460
1,260
1965
15,960
5,600
7,980
2,380
1966
15,400
5,600
7,700
2,100
1967
14,840
5,600
7,420
1,820
The sole issue for our consideration is whether certain advances by decedent-taxpayer to York constituted solely debt or a combination of debt and equity capital. If some of the advances were properly equity contributions to capital, the monies received by decedent-taxpayer from York with respect to this equity interest might represent taxable dividends and not an aggregate of taxable interest and nontaxable return of principal. There is no single test or criterion for determining whether decedent-taxpayer's advances to York represent debt or a combination of debt and equity. See John Kelley Co. v. Commissioner, 326 U.S. 521 (1946); and Charles E. Curry, 43 T.C. 667 (1965). *275 Each debt versus equity case must be 12 decided on the basis of its own unique facts and circumstances. See Harlan v. United States, 409 F.2d 904 (C.A. 5, 1969); Tomlinson v. 1661 Corporation, 377 F.2d 291 (C.A. 5, 1967); and Green Bay Structural Steel, Inc., 53 T.C. 451 (1969). In the final analysis, this decision is factual, and the burden of proof is on the petitioner. See Robert W. Adams, 58 T.C. 41 (1972); Anthony Mennuto, 56 T.C. 910 (1971); and Malone & Hyde, Inc., 49 T.C. 575 (1968), acq. 1968-2 C.B. 2. After evaluating the facts in the instant case, we are convinced that all of petitioner's advances to York constituted debt. In reaching our decision, we considered both petitioner's intent in making the advances and the economic realities surrounding the advances. With respect to the factor of intent, we are cognizant that the Fifth Circuit disregards subjective intent in debt versus equity cases where the involved instruments are clear and unambiguous.See United States v. Snyder Brothers Company, 367 F.2d 980, 982-983 *276 (C.A. 5, 1966). However, the Fifth Circuit has also stated that subjective intent may be considered where the objective intent of the parties cannot be ascertained due to internal ambiguities in the formal instruments. See Harlan v. United States, supra, at 908. In the case at bar, the instruments are ambiguous and contain a mixture of debt and equity indicia. The instruments are captioned as notes. Moreover, the provisions in the instruments call for the payment of a specific principal amount and a 13 fixed interest rate of 5 percent per annum. These are all indicia of debt. See Harland v. United States, supra, at 909. On the other hand, however, the fact that no stated maturity date was provided for in the instruments is indicative of equity. See Jones v. Commissioner, 357 F.2d 644 (C.A. 6, 1966), affirming a Memorandum Opinion of this Court. Accordingly, since the involved instruments are internally ambiguous we have adhered to the Fifth Circuit's analysis in Harlan v. United States, supra, and have considered the parties' intent as one factor in resolving the instant debt versus equity inquiry. We are persuaded *277 that decedent-taxpayer and York intended that decedent-taxpayer's advances to York should represent bona fide indebtedness. Decedent-taxpayer corresponded frequently with Phillip M. Spalding, York's president, during the immediate period prior to the occurrence of the advances in issue. Decedent-taxpayer constantly referred in this correspondence to his willingness to advance money to York and clearly indicated that he intended for these advances to constitute debt. Decedent-taxpayer's intent that the advances should represent debt is further substantiated by the fact that York also regared the advances as debt obligations and consistently reflected these obligations as notes payable to individuals in the noncurrent liabilities segment of its unaudited balance sheets for the years 1963 through 1965. Decedent-taxpayer's correspondence with Spalding does 14 contain suggestions that decedent-taxpayer's characterization of his advances to York as loans was at least partially motivated by his desire to minimize York's Federal income tax liability. However, tax minimization in itself is neither evil nor an improper objective of corporate management. See Murphy Logging Co. v. United States, 378 F.2d 222 *278 (C.A. 9, 1967). We have determined, therefore, that the presence of this factor does not vitiate our conclusions that the parties intended that all advances by decedent-taxpayer to York should constitute valid debt and that the loan transactions between decedent-taxpayer and York were not mere shams. Our decision in the case at bar has resulted largely from an evaluation of the economic realities of the purported loans. Decedent-taxpayer was a shrewd man who possessed a solid business acumen. He had the perception to realize that strong management and agressive modernization and expansion of existing equipment and facilities could greatly enhance York's profitability. In order to enable York to achieve its economic potential, decedent-taxpayer was instrumental in York's hiring of Spalding as its president and also actively encouraged Spalding in the latter's efforts to modernize York's physical plant. Decedent-taxpayer's belief that such measures would enhance York's success was justified, since York's retained earnings account increased from approximately $251,000 in 1963 to approximately $349,000 in 1965. These facts support 15 petitioner's contention that decedent-taxpayer *279 reasonably anticipated at the time of his advances to York that the advances would be repaid. Moreover, this contention is further solidified by the fact that York did make timely payments of both principal and interest to decedent-taxpayer during each of the years in issue. See Jack Daniel Distillery v. United States, 379 F.2d 569 (Ct.Cl., 1967); and Baker Commodities, Inc., 48 T.C. 374, 397-398 (1967), affd. 415 F.2d 519 (C.A. 9, 1969), certiorari denied 397 U.S. 988 (1970). An essential criterion in analyzing the economic reality of a purported loan is whether an independent third party would have extended credit to the debtor under the existing circumstances. See Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (C.A. 3, 1968). It is significant that York was able to borrow a substantial amount of money in 1962 from the York Bank & Trust Company and the Philadelphia National Bank. Accordingly, since decedent-taxpayer did reasonably expect that his advances to York would be repaid and since York was able to *280 borrow additional monies from unrelated third parties, we have concluded that all of decedent-taxpayer's advances to York were genuine loans. We are aware that decedent-taxpayer was required to subordinate his purported debt interest in York to that of the two bank creditors. However, subordination in itself is not conclusive of equity. See Commissioner v. H. P. Hood & Sons, 16 141 F.2d 467 (C.A. 1, 1944), affirming a Memorandum Opinion of this Court; and Sabine Royalty Corporation, 17 T.C. 1071 (1951). To the contrary, subordination to institutional financial creditors is becoming increasingly common in the business world and should not in itself preclude the instant advances from constituting bona fide indebtedness. See Baker Commodities, Inc., supra, at 399. Respondent contends that at least one-half of decedent-taxpayer's advances to York lacked the substantial economic reality of loans and thus constituted risk or equity capital. Respondent supports this contention by reference to the following principal factors: (1) the instruments issed by York to decedent-taxpayer did not contain a fixed maturity data; (2) decedent-taxpayer *281 recognized the favorable tax benefits resulting from usage of debt vis-a-vis preferred stock; (3) decedent-taxpayer's debt interest in York was subordinated to the bank creditors' debt interest in York; and (4) decedent-taxpayer's advances to York were required to provide York with essential working capital. We are not persuaded by this contention. We have already discussed and disposed of the first three factors previously in this opinion. With respect to the remaining factor, we recognize that decedent-taxpayer's advances to York were essential in facilitating York's modernization and expansion program. Nevertheless, this factor is consistent with our conclusion that decedent-taxpyer reasonably anticipated 17 that his advances to York would be repaid. Decedent-taxpayer correctly perceived that such repayment would be made possible by the increased cash flow resulting directly from York's modern and expanded facilities. See Malone & Hyde, Inc., supra, at 579. Accordingly, we have concluded that neither this factor nor the other factors indicated by respondent negate our holding that all of decedent-taxpayer's advances to York constituted bona fide indebtedness.
*282 To reflect the concessions of the parties on other issues, Decision will be entered under Rule 50.