ROBERT W. ADAMS AND ELEANOR ADAMS CORSON (FORMERLY ELEANOR C. ADAMS), ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5461–68—5463–68.   Filed April 17, 1972.

*Stanley L. Drexler,* for the petitioners.
*Charles H. Powers,* for the respondent.

---

[1] Cases of the following petitioners are consolidated herewith: Robert W. Adams and Rita A. Adams, docket No. 5462–68 ; and Robert W. Adams, Transferee, docket No. 5463–68.

FAY, *Judge:* Respondent determined deficiencies in the Federal income taxes of the petitioners, as follows:

| Docket No. | Petitioners | Year | Deficiency |
|---|---|---|---|
| 5461-68 | Robert W. Adams and Eleanor Adams Corson (formerly Eleanor C. Adams) | 1962<br>1963 | $168,482.88<br>37,126.51 |
| 5462-68 | Robert W. Adams and Rita A. Adams | 1964 | 5,937.36 |
| 5463-68 | Robert W. Adams, transferee | 6/30/62<br>6/30/63 | 13,869.75<br>299,696.01 |

Additionally, respondent by an amended answer filed March 17, 1971, requested in docket No. 5463-68 an increased deficiency against Wyoming Mining & Milling Co. and increased transferee liability against Robert W. Adams, as shown:

| Year | Amount of increased deficiency | Deficiency determined per notice of liability | Total |
|---|---|---|---|
| 6/30/62 | $5,335.30 | $13,869.75 | $19,205.05 |
| 6/30/63 | 56,663.46 | 299,696.01 | 356,359.47 |

After certain concessions by each party, the following questions remain for our consideration:

(1) Whether an exchange of a uranium mine for a purported debt instrument was a transfer within section 351.[2]

(2) Whether the purported debt instrument was a stock or security as contemplated by section 351(a) or other property within the meaning of section 351(b).

(3) The correct value of the purported debt instrument.

(4) Whether a sum advanced to Robert W. Adams' wholly owned corporation was a loan or a payment of advance rentals and royalties.

(5) Whether Robert W. Adams' corporation repaid any of the advanced amount by way of adjusting the actual consideration paid in a section 337 liquidation sale.

(6) Whether section 1341 applies to the alleged repayment.

(7) Whether a corporation is entitled to a deduction for deferred development expenses incurred by another taxpayer.

(8) Whether a corporation must realize additional income from the restoration of depletion.

(9) The proper salvage value for depreciable equipment used in taxpayer's trade or business.

(10) The proper amount of reserves for determining depreciation and depletion.

(11) The proper disposition of certain adjustments made to taxpayer's taxable income for the year 1964, which reflects respondent's interpretation of the foregoing issues.

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

The petitioners Robert W. Adams (sometimes hereinafter referred to as Adams or petitioner) and Eleanor Adams Corson (formerly Eleanor C. Adams) at docket No. 5461–68, were husband and wife during the calendar years 1961, 1962, and 1963. At the time the petition was filed, Adams resided in Denver, Colo., and Eleanor Adams Corson resided in Cheyenne, Wyo.

For the calendar years 1961, 1962, and 1963, the petitioners, Adams and Eleanor Adams Corson, filed joint income tax returns with the district director of internal revenue, Denver, Colo., on the cash method of accounting.

The petitioners Robert W. Adams and Rita A. Adams, at docket No. 5462–68, were husband and wife during the calendar year 1964, and both resided in Denver, Colo., on the date the petition was filed. For the calendar year 1964, the petitioners, Adams and Rita A. Adams, filed a joint income tax return with the district director of internal revenue, Denver, Colo., on the cash method of accounting.

The period of limitations on assessment for the taxable years 1962, 1963, and 1964 was open at the time of the issuance of the statutory notices of deficiency under consents executed pursuant to section 6501(c)(4).

Wyoming Mining & Milling Co. (hereinafter referred to as Wyoming), a Wyoming corporation, was an accrual basis taxpayer with a fiscal year accounting period. Adams, as transferee of Wyoming, transferor, agrees that he is liable for such deficiencies as may be determined at docket No. 5463–68 to be due from Wyoming. At the time of the issuance of the statutory notice of liability to Adams as transferee of Wyoming, the period of limitations on assessment was open pursuant to the provisions of section 6901(d).

During the years 1951 through the present, the Atomic Energy Commission (AEC) adopted various practices in order to promote the production of uranium. It is necessary to summarize these practices.

During the period March 1, 1951, through March 31, 1962, the AEC purchased all uranium ores under the terms set forth in Domestic Uranium Program, circular 5. This circular, among other things, provided that ores delivered prior to March 31, 1962, would be permitted, in addition to the circular 5 price, a haulage allowance of 6 cents per ton-mile for transportation to a purchase depot up to a maximum of 100 miles. On May 24, 1956, the AEC announced a new uranium procurement program. The purpose of this new program was to guarantee

a Government market for U308 produced through 1966. Under this announcement, the AEC advised that the program would be commenced as of April 1, 1962, and the AEC would purchase uranium concentrate, U308, at a price of $8 per pound. This program was to continue through December 31, 1966. This new announcement did not provide for the continuation of the haulage allowance which was previously in effect.

On November 24, 1958, the AEC modified the 1962–66 procurement program which had been established by the May 24, 1956, announcement. The November 1958 announcement stated that under the 1962–66 procurement program the AEC would guarantee only the purchase of U308 from ore reserves developed prior to November 24, 1958. Any reserves developed after November 1958 would be purchased to the extent that requirements dictated. In support of this modification, the AEC then began awarding purchase allocations based on the amount of reserves developed prior to November 1958. Initially, these allocations, or quotas, were assigned to mineral property and ran with the property, conferring on the owners thereof the right to sell U308 to the AEC. The allocations could be met only from the specifically developed properties. Consolidation, a process by which unproductive properties with quotas could be combined with productive nonquota properties, was done on a very limited basis. Therefore, if consolidation could not be accomplished, many quotas assigned to unproductive properties went unmet.

On November 17, 1962, a further announcement reflected still another change in AEC policy for the years 1967 through 1970. The general feeling was that a private market would not develop for uranium until the late 1960s. In order to provide the uranium producers with a continuing industry to supply between 1966 and 1970, the AEC proposed a plan to "stretch out" its purchases over the years 1966–70. The new program contemplated deferral of a portion of the material contracted for delivery to the AEC prior to 1967 and the purchase by the AEC of an additional quantity equal to the amount deferred. A portion of the amount which the AEC contracted to purchase prior to 1966 was instead purchased in 1967 and 1968. The AEC in 1969 and 1970 then purchased an additional quantity of concentrates, equal to the quantity deferred and delivered in 1967 and 1968. As part of this "stretch-out" program, consolidation of producing properties within a group was made much easier. Consequently, after the November 1962 announcement, a quota assigned under the November 1958 announcement could have an independent value providing the property to which it was assigned could be subject to consolidation. With the foregoing in mind, we will find and review the specific facts of the present case.

## Facts Pertaining to the Debt-Equity Issue

The petitioner first formed Western Nuclear Corporation (Western) in March 1955. He served as its president from inception to the present date. At the time of the transactions in question, Adams was a minority shareholder in Western. In 1956, Western was awarded a contract to build a uranium mill in Wyoming. Commencing with operations and until 1962, Western's mill processed ores from the following sources: (1) Its own ores; (2) ores acquired from the AEC; (3) ores acquired from properties developed by Adams as an individual; and (4) ores acquired from properties developed by joint ventures comprised of Adams and other individuals.

The financing of Western was highly leveraged. The company received its first long-term financing of $6 million in 1959. This financing agreement imposed restrictions wherein Western was precluded from doing any of its own substantial exploration, development, and acquisition of new mining claims needed for the milling process. As of September 1960, Western's listing on the American Stock Exchange placed both Adams and Western in a peculiar situation. Western, in need of raw materials for milling, was unable to develop its own properties. Furthermore, the directors believed it unwise to purchase properties from its president, Adams, at a profit. Western's board of directors felt that such purchases from Adams would possibly conflict with SEC regulations. In order to meet Western's needs and avoid any possible SEC conflict, the following situation developed: Adams, operating independently of Western, developed uranium properties individually and through joint ventures. Prior to 1961 if the properties acquired turned out to be good, then Adams sold them to Western at cost and only his coventurers were allowed to profit. If the properties turned out to be bad, Adams absorbed the loss. As a result of these practices, by 1961 Adams had incurred an indebtedness of approximately $600,000. Adams' desire to clean up these debts was the genesis of many of the transactions important to the case at bar.

In his search for uranium properties, Adams purchased two claims that are of primary concern here. In October 1959 he purchased a group of claims located in Fremont County, Wyo., from Two States Uranium Corp. (Two States) for a consideration of $70,000 consisting of cash or property having a value of $23,000 and two interest-bearing promissory notes in the amounts of $21,000 and $26,000 which were due and payable on April 21, 1960, and July 1, 1960, respectively. After this acquisition, Two States held no other mining properties except the Joe claims. The Joe claims had no proven resources and no AEC purchase allocation. Adams believed the Joe claims had great future potential because they were very near sizable bodies of ore.

On October 8, 1960, in order to acquire the Joe claims, Adams made a tender offer to purchase all of the issued and outstanding stock of Two States. This offer was accepted by the shareholders of Two States and Adams thereafter became the owner of all of the outstanding shares of Two States for a total of $85,402.80, which was paid by Adams in shares of Western. The assets of Two States at this time consisted of the Adams notes totaling $47,000, the Joe claims, and some inconsequential property and equipment.

In 1959 Adams purchased, subject to a 6-percent overriding royalty interest retained by third parties, certain mining claims located in Converse County, Wyo., known as the Skul-Spook claims. Adams operated the Skul-Spook claims in 1960 and 1961 as the Douglas operation. Sales by the Douglas operation were made under the AEC circular 5 price and petitioner received the benefit of the haulage allowance which was still in existence at that time. The AEC on November 30, 1961, assigned a purchase allocation (quota) to the Skul-Spook claims for an adjusted amount of 522,000 pounds of U308. This allocation was pursuant to the November 1958 announcement and did not include a haulage allowance. The Skul-Spook claims' profitability depended heavily on this revoked haulage allowance. In fact, the transportation cost alone of bringing the 522,000-pound allocation to the mill was over $1 million. Therefore, after the discontinuance of the haulage allowance, Adams was hard pressed to find a way of substantially reducing his transportation costs. Consequently, he gave a great deal of consideration to the use of preconcentrating technique.

A preconcentrating technique is a method by which uranium ore components consisting of sand, rock, and uranium material are separated at the mine site. If such a process is successful, only the uranium mineral needs to be shipped to the mill, thus reducing the direct haulage costs from $1 million to about $16,000.

The Colorado School of Mines Research Foundation, Inc. (Colorado School), conducted a series of tests on Skul-Spook ore and determined that such ore was amenable to a preconcentrating technique. The recommended wet-process technique for preconcentrating uranium ores was new and untried. While previous attempts to preconcentrate uranium ore by the use of a dry technique had failed, the wet technique had been successfully applied to other minerals. The Colorado School had established a pilot plant, and based on tests in this plant there was every reason to believe the wet process as applied to Skul-Spook would prove successful.

On April 7, 1961, Adams authorized the Colorado School to prepare an economic feasibility study of alternative plans for operating, mining, and upgrading the Skul-Spook ore body. The report was paid for by Adams or Western at a cost of about $25,000 and was to be

used for obtaining financing or to inform any potential purchasers of Skul-Spook of its earnings capacity. The Colorado School is highly regarded in the uranium industry and its valuations and projections are accepted by banks and other lending institutions. The results of the study of May 11, 1961, conducted by the Colorado School indicated that a successful operation of the preconcentrating technique would result in an estimated fair market value in excess of $2 million for Skul-Spook ore reserves. This study later proved to be somewhat inaccurate and many of the original cost estimates were adjusted upward. Even though a considerable number of expenses were not provided for in this report, based on the available information, we find that the Skul-Spook claims were worth a minimum of $1 million at the time of the Colorado School study.

Adams, after studying the results of the report, felt that it would be feasible to clear up all of his financial problems by using the profits from an outright sale of the valuable Skul-Spook claims.

He attempted to sell the claims to Vitro Minerals Corp. (Vitro) which operated a mill in Salt Lake City, or Susquehanna which operated mills at Edgemont, S.D., and Riverton, Wyo. He wanted to realize at least $1 million from the sale. Because Vitro's mill was located far from the mine site, Vitro's cost of operating Skul-Spook would be rather high. The offer eventually made by Vitro was for $750,000. Adams considered further alternatives to realize what he believed to be the true worth of the claims. He felt his ultimate solution was to somehow sell Skul-Spook in its entirety to Western for $1 million while at the same time avoiding the restrictions imposed on Western by its creditors. Western was willing to pay $1 million for Skul-Spook. First, he considered using Two States to achieve his objective, but operation through Two States was eventually deemed inappropriate. Adams was advised, however, to operate through some corporate form in order to limit his liability and to facilitate public financing of the cost of the preconcentrator.

Adams finally decided on the formation of a new corporation. Wyoming was incorporated and articles of incorporation were filed with the secretary of state of Wyoming on September 25, 1961. Under an instrument dated October 1, 1961, Adams transferred his interest, consisting of 229,204 shares of common stock of Two States to Wyoming and received in exchange therefor 85,349 shares of the common stock of Wyoming, constituting all of the issued and outstanding stock.

On September 28, 1961, Adams executed a mining deed to Wyoming conveying certain mining claims which included the Skul-Spook claims.

On October 1, 1961, an instrument was executed under which Wyoming promised to pay to the order of Adams $1 million with interest at 6 percent per annum due December 31, 1963. Wyoming on its books and records reflected the aforementioned instrument as a note payable issued in exchange for the purchase of the Skul-Spook claims and certain equipment with an approximate value of $22,000. After these two transactions, the book value of Wyoming's debt-equity ratio was in the neighborhood of 12:1 ($1 million to $85,349).

The petitioner on his 1961 joint income tax return showed the transaction as a sale of the Skul-Spook (Douglas operation) to Wyoming and reflected a sales price of $1 million resulting in a taxable gain of $567,471.40.

In addition to the transfer of the Two States stock, the Skul-Spook claims, and miscellaneous equipment to Wyoming by Adams, at some point during Wyoming's existence Adams transferred to Wyoming his interest in the Grace ore payment and Star Lake properties. These were the final outstanding properties which Adams acquired individually and this transfer served to complete his intention of gathering all of his individual ore properties in one final venture.

Once the transfers to Wyoming were completed, a preconcentrator was built in the site of the Skul-Spook claims by Wyoming. Wyoming raised the money by issuing notes to a number of Adams' friends who had supplied funds in the past for Adams' acquisition of properties. Many of these notes were personally guaranteed by Adams. This further increased the debt-equity ratio to approximately 17:1.

*Facts Pertaining to the Advance Payment of Rents and Royalties*

Sometime after May 1961 and about the time that Wyoming was incorporated, it was decided, subject to the consent of the banks having the power to give or withhold the requisite consent under the loan agreement with Western, that Wyoming would not assemble a staff and mine the Skul-Spook claims but would receive rent and royalty from Western. The rent was a payment for the use of the preconcentrator and the royalty payments were consideration for ore mined from Skul-Spook. The banks gave their consent in January 1962 and ultimately the claims were mined on this basis.

A lease and mining deed was executed between Wyoming and Western on February 15, 1962, and February 28, 1962, respectively. Under the lease and mining deed, Wyoming was to receive from Western rents of $1.50 per pound of U308 from Skul-Spook ores processed through the preconcentrator and $2 per pound of U308 for royalties on the ores produced from the said claims. Under the proposed operating agreement, Wyoming would realize sufficient revenues

to cover its total costs, including the purchase price of the Skul-Spook assets, and realize a net profit before taxes of $21,725.

The due date of virtually all the notes issued by Wyoming to obtain funds to build the preconcentrator was July 1, 1962. At the time these notes were issued, it was recognized that the income from the contemplated agreement with Western would not be sufficient to meet the obligation on the various notes and a refinancing would be required. Wyoming requested a loan from the Central Bank & Trust Co. in Denver. The proposed loan cleared the loan committee and the executive committee but was turned down by the board of directors.

Adams and Wyoming, unable to secure refinancing of the short-term obligation, submitted their problem to Western. Western was at that time refinancing certain of its obligations and entered into a new loan agreement whereby Western was authorized to borrow $1 million for the purpose of paying advance rents and royalties to Wyoming. On September 18, 1962, the board of directors of Western, at a regular meeting, resolved the following:

that the appropriate officers of Western Nuclear, Inc. * * * be and they are hereby authorized, empowered and directed to pay to Wyoming Mining & Milling Company * * * *advance royalties and rental payments in respect of uranium concentrate to be produced from the Skul-Spook group of lode mining claims and processed in the preconcentrator* operated by the Company * * * up to an aggregate advance payment not exceeding $940,000 and, further,

RESOLVED, that the appropriate officers of the Company be and they are hereby authorized, empowered and directed to obtain from Wyoming Mining & Milling Company and its principal officer and stockholder such guarantee and security including favorable options on the stock or assets of Wyoming Mining & Milling Company as may be necessary or appropriate to secure and indemnify the Company against any loss with respect to the *advance payments of royalty and rental hereinabove authorized,* * * *

[Emphasis added.]

Neither Adams nor Wyoming executed a note or other debt instrument in connection with the advance rental and royalties, nor did they give the guarantees or the options called for to secure or indemnify Western against loss with respect to the advance rents and royalties.

It was expected that the advance payment of rents and royalties was to be paid out of future production from the claims. There were no restrictions placed on Wyoming's right to the use of the advance payment of rents and royalties. Wyoming reflected the advance payment of $940,000 under an account entitled "Deferred Royalty Income."

Charles I. Brown, serving as treasurer of both Wyoming and Western, stated in a letter to the Bank of New York, Central Bank & Trust Co., that—

Although the preconcentrating technique was a proven success, Wyoming was not able to obtain a bank loan with which it had hoped to refinance approximately $1,000,000 of short-term obligations. With the consent of its Board of

Directors and Lending Banks, Western borrowed the $1,000,000 and advanced it to Wyoming (after discounting $60,000 to cover its own interest expense) as a prepayment against royalties and lease payments to be earned under the Operating Agreement. .

Commencing October 1, 1962, all rents and royalties due to Wyoming for ore mined after October 1, 1962, were applied to the "Deferred Royalty Income" account to reduce the balance of that account. After application was made for royalties and rents earned during August of 1963, there remained a balance outstanding in the deferred account of $532,894.84.

*Facts Pertaining to the Sale Pursuant to a Section 337 Liquidation*

Under the terms of the mining deed of February 28, 1962, it was acknowledged that the AEC purchase allocation for the Skul-Spook claims was to be used by Western in its contracts with the AEC. In fact, on April 1, 1962, Western's contract with the AEC was altered to include a purchase allotment for the Skul-Spook claims. However, this agreement did not extend to Western as lessee the right to freely transfer this purchase allotment.

Prior to November 17, 1962, as a general rule the AEC purchase allocations were required to be applied only to the ores which were mined from the claims to which the allocation had originally been assigned. However, as previously stated, the November 17, 1962, announcement had the effect of separating the quotas from the underlying property. It then became desirable for a producer with a valuable mine and insufficient quota to marry his property with a bad property subject to a sufficiently large quota. It was generally acknowledged in the industry that a good quota, usable for consolidation purposes, was worth about $2 a pound.

On July 15, 1963, the board of directors of Wyoming resolved that Wyoming would completely liquidate and dissolve and that Wyoming's properties would be sold pursuant to a plan of liquidation with all of the assets of the said corporation to be distributed to its shareholders within 12 months.

As of September 1963, the time of Wyoming's actual liquidation, Western had stockpiled ore from Skul-Spook containing 76,142 pounds of U308 yellow cake. This ore was not processed through the preconcentrator as of that date and rents and royalties were not charged to reduce the "Deferred Royalty Income" account. In September 1963, Western purchased the assets of Wyoming for a total purchase price of $1,032,894.82.[3] The consideration for this purchase was $500,000

---

[3] The slight discrepancy between the purchase price and the consideration paid is not explained.

cash and a cancellation of the $532,894.84 amount due Western as a return of the unearned advances held by Wyoming. Wyoming and Western expressly provided that the unearned advances held by Wyoming would be returned to Western once the rent and royalty contract was terminated. The amount due Western resulted specifically from Wyoming's failure to supply the remaining goods and services under the original lease and deed of February 15 and 28, 1962.

On its return for the taxable year ended June 30, 1964, Wyoming reflected the sale of its assets to Western, as follows:

| Property | Date | | Sales price | Depletion or depreciation allowable | Cost or other basis | Other gains (losses) |
| | Acquired | Sold | | | | |
|---|---|---|---|---|---|---|
| Equipment | 5/1932 | 9/1963 | $3,545.26 | $11,847.23 | $15,392.49 | |
| Preconcentrator | 5/1962 | 9/1963 | 150,000.00 | 272,295.01 | 506,427.75 | ($84,132.74) |
| Lease | 5/1962 | 9/1963 | 784,000.56 | 744,137.54 | 985,173.00 | 542,965.10 |
| Star Lake Property | 11/1962 | 9/1963 | 10,000.00 | | 10,000.00 | |
| Grace ore payment | 11/1962 | 9/1963 | 85,349.00 | | 85,349.00 | |
| | | | 1,032,894.82 | 1,028,279.78 | 1,602,342.24 | 458,832.36 |

The $500,000 cash consideration was deposited in the bank account of Wyoming and almost concurrently Adams received checks drawn on Wyoming's bank account for a sum total of $500,000.

Adams and Wyoming had many related transactions. These were reflected in an accounts receivable ledger. When Adams paid Wyoming's expenses, this ledger was adjusted to reflect a deficit balance, or an amount due Adams from Wyoming. If Wyoming covered personal expenses of Adams, the account was adjusted to show an amount due Wyoming from Adams. The $500,000 disbursement to Adams caused the accounts receivable ledger to show a balance due from Adams of $447,939.12. This account was later reduced by applying the balance due on the note payable in the amount of $342,540.78. This constituted full payment of that note. The account was further reduced by applying to it an amount due Adams for the purchase of Star Lake properties, Grace properties, and other miscellaneous items. The remaining balance of $3,610.51 in the account was then charged to earned surplus.

### Facts Pertaining to Depreciation and Depletion

During the years ended June 30, 1962, 1963, and 1964, Wyoming depreciated its preconcentrator and its equipment under the "unit-of-production basis." This method allows depreciation as units of production, pounds of U308, are produced from the Skul-Spook claims.

For the taxable year ended June 30, 1962, the transferor used a zero salvage value for both the preconcentrator and the equipment.

Wyoming on its return for the taxable years 1963 and 1964 used the salvage value of $150,000 for the preconcentrator and a zero salvage value for all other equipment.

In computing depletion and depreciation for the taxable year ended June 30, 1964, Wyoming used estimated revised reserves computed with respect to the taxable year 1963, as adjusted to reflect production for the said taxable year. These estimates of reserves for the taxable years ended June 30, 1963 and 1964, did not take into consideration reserves in place which, when produced, resulted in 30,519 pounds of U308.

Respondent in his notice of liability adjusted both Adams' and Wyoming's income. These adjustments reflect respondent's determination that the transfer of Skul-Spook to Wyoming was in exchange for an equity interest in Wyoming. Based on this interpretation, the respondent made adjustments in the following areas:

(1) Basis for depreciation, basis for cost depletion,[4] computation of gain or loss on sale or exchange;

(2) Deductibility by corporation of payments of purported interest;

(3) Treatment of the receipt of amounts from Wyoming by Adams; and

(4) Treatment of deferred development expenses.[5]

Furthermore, respondent in his notice of liability, adjusted Wyoming's income to include the full amount of the advance payment of rentals and royalties received in the taxable year ended June 30, 1963. Respondent permitted depletion to offset the above royalty inclusion to the full extent of available reserves for the taxable year ended June 30, 1963.

In September 1963, the sale of certain of its assets caused Wyoming to terminate its interests in an amount of Skul-Spook's ore. This ore had been the subject of the previously mentioned depletion allow-

---

[4] In many instances, gain realized on the transfer of property to a wholly owned corporation is considered as ordinary income when that transfer results in a stepped-up basis for certain cost recovery situations. Respondent having failed to assert the possible applicability of sec. 1239 to *depletable* property, we need not confront the issue herein.

[5] Respondent in his deficiency notice to Wyoming for the taxable years ended June 30, 1962 and 1963, allowed additional deductions to Wyoming as transferee of Adams. This allowance amounted to $119,228.38 for deferred development expenses, relating to Skul-Spook, originally incurred by Adams. The allowance arose out of respondent's determination that the transfer of the Skul-Spook claims was in exchange for an equity interest pursuant to secs. 351 and 362(a). Respondent determined originally that Wyoming, in assuming Adams' cost basis for Skul-Spook, would also be able to assume Adams' deferred development expense account.

Pursuant to a motion to amend, respondent later alleged, in an amended answer, that Wyoming as the recipient of the Skul-Spook property, was not entitled to the benefit of the allowed deductions. The theory of this amended answer is that the entitlement to a deduction for development expenses is limited to the taxpayer who incurred the expenses and such entitlement to the deduction may not be passed on by reason of the transfer of property to which the expenses pertain.

ance and had not been extracted by the time Wyoming sold Skul-Spook.

Respondent, in his adjustments for the year 1964, determined that the termination of Wyoming's entitlement to depletion required Wyoming to restore to income the sum allocable to the depletion realized on the unrecovered ore.

Respondent made further adjustments to Wyoming's return for the taxable year ended June 30, 1964. These adjustments, which will be more fully explained in the opinion portion of this decision, served to reduce petitioner's claimed loss for 1964 to $14,666.01. The adjustments are as follows:

```
Loss shown on return_____ ($97, 211. 99)
Increases and decreases in income:
    Interest expense disallowed_____   3, 325. 41
    Depreciation expense disallowed_____   4, 946. 97
    Depletion disallowed_____ 145, 239. 26
    Restoration of depletion_____  89, 394. 01
    Royalty income eliminated_____ (91, 634. 47)
    Rental income eliminated_____ (68, 725. 20)
                                                        _____
Loss allowed by respondent_____  14, 666. 01
```

### ULTIMATE FINDING OF FACT

At the time Adams transferred the Skul-Spook property to Wyoming, Skul-Spook was worth a minimum of $1 million.

### OPINION

The initial question to be determined is whether the transfer of Skul-Spook properties and the organization of Wyoming were steps in a transaction governed by section 351 or whether the Skul-Spook transfer is to be recognized as a valid sale. In the event we find a section 351 exchange, we must further determine whether the $1 million note received by Adams is stock or security within the meaning of section 351(a) or "other property" as that term is used in section 351(b).[6]

---

[6] SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.

(a) GENERAL RULE.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property.

(b) RECEIPT OF PROPERTY.—If subsection (a) would apply to an exchange but for the fact that there is received, in addition to the stock or securities permitted to be received under subsection (a), other property or money, then—

    (1) gain (if any) to such recipient shall be recognized, but not in excess of—

        (A) the amount of money received, plus

        (B) the fair market value of such other property received; and

    (2) no loss to such recipient shall be recognized.

54

The issue essentially is one of debt versus equity and our holding as to this issue affects various consequences for Federal income tax purposes in the present case.

On October 1, 1961, Adams completed two transfers to Wyoming. After completing the transfers, Wyoming was comprised of the Skul-Spook properties and all of the common stock of Two States. Adams became the sole shareholder of Wyoming and held an evidence of indebtedness from Wyoming in the sum of $1 million. The note payable had a fixed maturity date of December 31, 1963, and a fixed interest rate of 6 percent per annum. Based on book value, Wyoming's debt-equity ratio was 12 :1.

We note that immediately after the exchange the control requirements of section 351(a) and 368(c)[7] had been met.

Whether a transfer of property to a corporation, for purposes of Federal taxation, is a sale as distinguished from an exchange within section 351, requires consideration of all the facts. No rule of thumb applies; * * * [*George A. Nye*, 50 T.C. 203, 211 (1968), citing *Gooding Amusement Co.* v. *Commissioner*, 236 F.2d 159, 165 (C.A. 6, 1956), affirming 23 T.C. 408 (1954), certiorari denied 352 U.S. 1031 (1957).]

Based on all the facts in the present case, we are convinced that the evidence presented justifies a holding that the transaction is governed by section 351. Both transfers were interdependent steps in the formation of Wyoming and that section is applicable. See *Camp Wolters Enterprises* v. *Commissioner*, 230 F.2d 555 (C.A. 5, 1956), affirming 22 T.C. 737 (1954), certiorari denied 352 U.S. 826 (1956). The above conclusion necessitates a consideration of whether the indebtedness qualifies as a stock or security in Wyoming, or other property. See *George A. Nye*, 50 T.C. 203 (1968); *Camp Wolters Enterprises* v. *Commissioner*, supra; and *Peter Raich*, 46 T.C. 604, 612 (1966).

Because of the complexity of the factual situation, a brief summary of the transactions is helpful in our consideration.

First, we find Adams in possession of uranium property which was worth no less than $1 million. Valuation, in the final analysis is, essentially, a question of fact. See *Estate of David Smith*, 57 T.C. 650 (1972); *Daniel S. McGuire*, 44 T.C. 801, 812 (1965).

Adams was faced with the following dilemma: A sale to Vitro would force him to accept $750,000 for an asset which he correctly believed was worth at least $1 million. On the other hand, an outright sale to Western for $1 million was prohibited by Western's creditors.

---

[7] SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.

(c) CONTROL.—* * * the term "control" means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation.

Adams was intent on selling Skul-Spook and realizing $1 million. He was interested simply in realizing quick cash, not in running a mining business. Were it not for restrictions preventing Western from accomplishing an outright purchase, Western would have paid Adams' price and a sale to Western for $1 million would have ended Adams' problems immediately.

Western, however, was not restricted from paying royalties, and mining a claim with proven reserves. Herein lay Adams' opportunity to accomplish his aim. He decided to sell the claim to his own corporation in return for a debt instrument. This corporation would then lease the mine to Western for royalty payments and promptly pay off his note by either borrowing a sufficient sum or receiving advance payments from Western to the extent of the unmined proven reserves.

Adams understood that ore from Skul-Spook could only be developed profitably if a preconcentrating device was successful, and based on respected studies there seemed to be little doubt of such success. The completion of the project and subsequent sale of preconcentrated ore to Western seemed a virtual certainty. In essence, Adams formed Wyoming to indirectly achieve what he was directly prohibited from doing, a sale of Skul-Spook for its true value, $1 million. He achieved his aim when Wyoming received $940,000 in advance from its only customer. The exchange of Skul-Spook worth $1 million for a $1 million note involved no subterfuge. The purchase price was not disproportionate to the actual fair market value and the note received had a fair market value of $1 million. Recovery on the note was a virtual certainty; in fact, it was completely repaid prior to its maturity date. Recovery was not based on the success of the project, merely on its ultimate completion.

Once the initial transfer was completed, Wyoming and Western apparently harmoniously continued the lease and rental arrangements. Then in November 1962 a new factor appeared. Prior to this time, the right to sell ore to the AEC (the quota) was generally inseparable from the ore. However, a new procedure permitted the quotas to be transferred independently. Wyoming found itself to be the owner of a property that overnight had increased in value as a result of this. However, since the mine and quota were already committed to the lease with Western, the increased value apparently was of little use to Wyoming. At this point, for reasons not revealed in the record, Western, and/or Wyoming decided that the leasing arrangements did not suit their purposes. Both corporations agreed to terminate the lease and sell all of the assets of Wyoming to Western. The decision enabled Western to have outright ownership of Skul-Spook and its valuable quota. Wyoming, due to the sale, was able to realize the increased value of Skul-Spook. At the time of the sale, Wyoming was

**56**

still holding over $532,000 of the advance from Western. Since the termination of the lease and subsequent sale would prevent Western from working off this deferred amount as a lessee, the parties reduced the agreed-upon sales price to reflect the unearned advance.

Based on our interpretation of the foregoing series of events, we hold the note received in exchange for Skul-Spook must be considered the receipt of "other property" within the meaning of section 351(b).

Having decided such, it is appropriate to turn to the specific facts and applicable standards which have led us to the conclusion that this valid short-term debt possessed no continuing investment quality and was not a stock or security within the meaning of section 351(a). Cf. *George A. Nye, supra* at 212–213.

The decided cases considering the question of whether a purported indebtedness is in fact a debt for tax purposes expound a myriad of tests and criteria. When, as in the present case, many of the tests both as to debt and equity are applicable, the final analysis ultimately depends upon the particular facts and circumstances of each case, with the taxpayer bearing the burden of proof. See *Anthony Mennuto*, 56 T.C. 910, 916–917 (1971), and cases cited therein.

One of the several principal tests recognized by the courts for determining this question is the intention of the parties, that is, whether advances to a corporation were intended to establish an actual debtor-creditor relationship or whether they were intended as capital contributions. *Christie* v. *Commissioner*, 410 F. 2d 759 (C.A. 5, 1969), affirming *Lots, Inc.*, 49 T.C. 541 (1968).

Intent in the present case is a meaningful factor. Petitioner's intention that this transfer be an exchange solely for debt is readily observed when one studies the consequences of an equity contribution.[8]

Such consequences would conceivably reduce the after-tax amount realized from Skul-Spook to very near the petitioner's original cost basis. Surely Adams did not intend a transaction with the sole purpose of benefiting the public fisc. Furthermore, a discernible intention to treat the note as debt is found in the fact that the note contained an unqualified promise to pay on a definite maturity date, a fixed interest rate, and was, in fact, repaid prior to the actual maturity date. "While the subsequent prompt repayment in full * * * cannot serve to create an indebtedness which otherwise is found not to exist, such fact is strong supportive evidence that the transaction involved was what it purported to be." *Anthony Mennuto, supra* at 917, and cases cited therein.

---

[8] The advance rentals and royalties received from Western would be taxable to Wyoming at ordinary-income rates. Wyoming's remaining after-tax profits distributed to Adams would be taxable to him as dividends to the extent of Wyoming's available earnings and profits.

Respondent cites as a test of significance the high debt-equity ratio of Wyoming. Thin capitalization is only one factor among many to be weighed. See *Rowan* v. *United States*, 219 F.2d 51 (C.A. 5, 1955). Using book value of the assets, Wyoming's ultimate debt-equity ratio of 17 :1 was well within the limits courts have accepted. See, for example, *Sun Properties* v. *United States*, 220 F.2d 171 (C.A. 5, 1955), (310 :1) ; *Baker Commodities, Inc.*, 48 T.C. 374 (1967), (692 :1), affd. 415 F.2d 519 (C.A. 9, 1969), certiorari denied 397 U.S. 988 (1970).

Generally, loans are recognized as creating a valid debtor-creditor relationship when there is a demonstrable business purpose and the transaction is not a tax-avoidance scheme. See *Byerlite Corporation* v. *Williams*, 286 F. 2d 285 (C.A. 6, 1960). No tax-avoidance scheme is present here, and respondent's reliance on *Burr Oaks Corp.*, 43 T.C. 635 (1965), affd. 365 F. 2d 24 (C.A. 7, 1966), certiorari denied 385 U.S. 1007 (1967), is misplaced. In that case, property was purchased for subdivision by three individual speculators and transferred to the corporate developer at an inflated price of more than twice its market value. The taxpayers hoped to use the sale to the corporation as a vehicle to realize capital gains on the inflated value. Clearly, that is not the case here. Furthermore, in *Burr Oaks Corp.*, at the time the property was transferred its business prospects could be described as only speculative and uncertain. Respondent, citing both *Burr Oaks Corp.* and *Camp Wolters Enterprises*, contends that when great risk is involved and the taxpayer's note will be repaid only if the untested venture proves successful, the note in question is actually an equity interest. In *Camp Wolters Enterprises, Inc.*, 22 T.C. 737 (1954), affd. 230 F.2d 555 (C.A. 5, 1956), certiorari denied 352 U.S. 826 (1956), this Court stated at 752—

It seems clear that the noteholders were assuming a substantial risk of petitioner's enterprise, and on the date of issuance were inextricably and indefinitely tied up with the success of the venture, in some respects similar to stockholders. * * *

It is our opinion that the risk involved herein was not substantial. Payment of Adams' note merely awaited completion of the mining venture by Western. Based on reliable reports available at the time, petitioner was justified in his belief that the project was solid. To say that the loans were at the risk of the business does not help respondent's case. All unsecured loans involve more or less risk. On all available information, the risk here was sufficiently small to warrant a conclusion that the advance was, in fact, a debt. See *Earle* v. *W. J. Jones & Son*, 200 F. 2d 846 (C.A. 9, 1952), a case involving taxpayers in the mining business, the probable success of which depended upon concentrating ores at the mine site. See also *Murphy Logging Co.* v. *United States*,

378 F. 2d 222 (C.A. 9, 1967), still another case in which probable success of the future enterprise was considered along with nominal capitalization in determining that consideration for a transfer was a bona fide debt.

In *Sun Properties* v. *United States, supra,* the court found on the following ultimate facts that a shareholder received valid debt in exchange for a warehouse which he transferred to his solely owned corporation.

(1) On the original transfer of a warehouse to the corporation for $125,000, the alleged fair market value, the agreement provided for the $125,000 to be paid off at the rate of $4,000 semiannually. No interest or downpayment was provided and the purchase price was not secured by a mortgage.

(2) The corporation had only nominal assets other than the warehouse and the alleged purchase payments were made out of rentals received.

(3) The transaction was not the type which would have taken place between parties at arm's length.

Petitioner's position is stronger than that of the taxpayer in *Sun Properties* and requires at least equivalent treatment.[9]

The second issue for disposition is the nature of the $940,000 advance made by Western to Wyoming.

It is the petitioner's contention that the advance was not "advance payments of rents and royalties" to Wyoming but, rather, a loan with an unconditional obligation to repay. We cannot agree with petitioner's contention. The cases are legion that where an accrual basis taxpayer is in actual receipt of advance payments for goods and rents and the amounts are received without restriction as to use or disposition, the taxpayer is required to include these amounts in its return for the taxable year in which they are received. See *Blue Flame Gas Co.,* 54 T.C. 584 (1970); *New England Tank Industries, Inc.,* 50 T.C. 771 (1968), affirmed per curiam 413 F.2d 1038 (C.A. 1, 1969); *United States* v. *Williams,* 395 F.2d 508 (C.A. 5, 1968); *American Automobile Assn.* v. *United States,* 367 U.S. 687 (1961).

It is also well established that determination of whether a particular payment is a loan depends upon the facts and circumstances of each case. See *New England Tank Industries, Inc., supra* at 777.

___

[9] Referring to the deferred development expense issue, petitioner on brief failed to answer respondent's amended answer and has correctly conceded the disallowance of these deductions affirmatively granted by respondent. By virtue of this Court's holding that Skul-Spook was exchanged for a debt instrument, sec. 351(b) is applicable and the deduction for such expenses must be disallowed as a matter of course. The development expenses are properly included in Adams' cost basis of Skul-Spook for purposes of determining recognized gain on the receipt of other property as required by sec. 351(b).

The assertion that payment from a lessee constitutes a loan will normally invite the close scrutiny of the Court to determine the true nature of such a transaction. The burden of proof in respect of such issue is particularly heavy where the purported loan is received from the lessee under circumstances suggesting the payment is, in effect, of advance rentals. * * * [*Blue Flame Gas Co., supra* at 594–595.]

Initially, most of the usual attributes of a loan are absent. There was no note or other evidence of indebtedness given. We see nothing to support a finding that any obligation of repayment existed other than one which was to be fulfilled by the supplying of goods and services to Western in the future. This is evidenced by Western's own minutes from the board of directors meeting of September 18, 1962.

The Chairman requested that the Directors consider and act upon a proposal to pay advance rentals and royalties of $940,000 to Wyoming Mining and Milling Company *for ore to be produced from the Skul-Spook group of lode mining claims* * * * and there preconcentrated for shipment to the Company's Split Rock Mill. * * * [Emphasis added.]

The minutes initially contemplating the transaction called for the officers of Western to obtain such guarantees and security as may be necessary to secure the company against any loss. However, this was never done. The payments were in fact completely unsecured. See *Kohler-Campbell Corporation* v. *United States,* 298 F.2d 911 (C.A. 4, 1962).

There is no evidence that the rents and royalties generated by the delivery of this ore were used to make loan repayments on behalf of Wyoming. In fact, commencing October 1, 1962, all rents and royalties actually due to Wyoming for ore mined after that date were applied to reduce the "Deferred Royalty Income" account.

The documents of Western and Wyoming add weight to the conclusion that both corporations considered these payments advance payments for goods and services. Wyoming carried the advances on its books as a "Deferred Royalty Income" account. Western, through its treasurer, stated in the letter of July 10, 1964 that—

Western borrowed * * * $1,000,000 and advanced it to Wyoming (after discounting $60,000 to cover its own interest expense) *as a prepayment against royalties and lease payments to be earned under the* * * * *Agreement.* [Emphasis supplied.]

The petitioner's plight is not unlike that of the taxpayer in *New England Tank Industries, Inc., supra.* In that case petitioner's predecessor in interest contracted with the Government to provide services and the use of facilities. The Government paid an excessive price for the work during the first year of a 5-year contract and the taxpayer claimed such payments were in effect loans and not includable in gross income when such excess payments were made. In holding that

the excess payments were income and not loans, the Court found the following facts to be persuasive:

Not only was no note or other evidence of indebtedness given, but there was no obligation (conditional or unconditional) on the part of petitioner to pay a sum (certain or uncertain) at any fixed or other maturity date. At no point in the documents is the relationship described in any terms other than the Government as the user of facilities and services and petitioner as the furnisher thereof. * * * [*New England Tank Industries, Inc., supra* at 777.]

In the case at bar, there is not a single indication to support the theory that this advance was anything other than an advance payment for goods and services. The evidence is conclusive that the payment was not a loan but rather an advance payment held by Wyoming without any restrictions or limitations.

Petitioner relies on *United National Corporation*, 33 B.T.A. 790 (1935). In that case we held on the facts that a purported sale of stock subject to a repurchase agreement between two related corporations was not a sale but actually a loan and mortgage of the stock. Under the repurchase agreement, either party to the agreement had the right to demand the repurchase of the stock by the purported seller. Since the buyer at any time could demand that the seller repurchase the securities, the Board of Tax Appeals held that the original transaction was no more than a mortgage. It is significant to note that the securities actually were redelivered to the seller at the same figure at which they were originally delivered, despite the fact that the values of the securities were different on the two dates.

The case of *United National Corporation, supra*, relied on by the petitioner is clearly distinguishable from the case at bar.

There are numerous issues remaining for decision. Petitioner and respondent both seek adjustments for 1964, a year not before this Court. Wyoming's return for the year 1964 reflects a net loss of $97,211.99. Respondent's adjustments would reduce this figure to a net loss of $14,666.01. Furthermore, the petitioner contends that should this Court find the previously discussed $940,000 advance to be advance rents and royalties taxable in the year of receipt, then Wyoming is entitled to a deduction for the unearned portion of the advance which it allegedly restored to Western in 1964.

As to the year 1964, section 6214(b)[10] grants the Tax Court, in redetermining a deficiency in income tax for any taxable year, the

---

[10] SEC. 6214. DETERMINATIONS BY TAX COURT.

(b) JURISDICTION OVER OTHER YEARS.—The Tax Court in redetermining a deficiency of income tax for any taxable year * * * shall consider such facts with relation to the taxes for other years as may be necessary correctly to redetermine the amount of such deficiency, but in so doing shall have no jurisdiction to determine whether or not the tax for any other year has been overpaid or underpaid.

power to consider such facts with relation to the taxes for other years as may be necessary correctly to redetermine the amount of such deficiency. In furtherance of the exercise of this power, there have been "numerous cases in the area of net operating losses which establish the proposition that it is proper, in determining a deficiency for an open year, to recalculate the amount of a net operating loss carryover from a barred year." *Anthony Mennuto, supra* at 923, and cases cited therein. See also *ABKCO Industries, Inc.*, 56 T.C. 1083 (1971).

There is no dispute that due to the carryback provisions the size of the net operating loss for 1964 will directly affect the deficiencies before this Court for the years 1962 and 1963.[11] Consequently, we must determine the proper inclusions and deductions from taxable income for the year 1964.

However, a dispute arises with petitioner's contention that not only must we determine proper deductions for 1964 but we must make an adjustment under the terms of section 1341[12] for any amounts held under claim of right and restored in 1964.

While it is true that we may determine whether the petitioner is entitled to a deduction for the year 1964, we do not think it proper that this Court make computations of tax as provided in section 1341 for that year. Section 1341(a)(5)(B), which petitioner urges upon us, is not a section which merely provides for a deduction in 1964. Rather, it is a section which provides a method for adjusting the actual tax liability for that year.[13] It is well recognized that this Court cannot resort to section 1341 to determine the computation

---

[11] Respondent on brief has conceded that petitioner may be entitled to the benefit of loss carrybacks from the year 1964.

[12] SEC. 1341. COMPUTATION OF TAX WHERE TAXPAYER RESTORES SUBSTANTIAL AMOUNT HELD UNDER CLAIM OF RIGHT.

  (a) GENERAL RULE.—If—

    (1) an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item;

    (2) a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and

    (3) the amount of such deduction exceeds $3,000,

then the tax imposed by this chapter for the taxable year shall be the lesser of the following:

    (4) the tax for the taxable year computed with such deduction; or

    (5) an amount equal to—

      (A) the tax for the taxable year computed without such deduction, minus

      (B) the decrease in tax under this chapter (or the corresponding provisions of prior revenue laws) for the prior taxable year (or years) which would result solely from the exclusion of such items (or portion thereof) from gross income for such prior taxable year (or years).

[13] H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., pp. 86–87 (1954), in discussing sec. 1341, states:

"The committee's bill provides that if the amount restored exceeds $3,000, *the taxpayer may recompute the tax for the prior year*, excluding from income the amount repaid. This is an alternative to taking the deduction in the year of restitution. * * * [Emphasis added.]"

of actual tax liability for a year which is not before us. Section 6214(b) specifically states we "shall have no jurisdiction to determine whether or not the tax for any other year has been overpaid or underpaid." See *Estate of Samuel Stein*, 40 T.C. 275, 277 (1963).

The question still remains as to whether Wyoming is entitled to a deduction in the year 1964 for its alleged repayment of income held under claim of right. It is claimed that of the $940,000 advance to Wyoming only approximately $408,000 was actually earned by August 31, 1963, and Wyoming therefore had the obligation to return to Western the unearned portion when the lease for Skul-Spook was terminated. It is further contended that in the section 337 liquidation sale of September 1963 Wyoming sold Western approximately $1,032,-000 in assets and received actual payment of $500,000. Therefore, the adjustment to the sales price was in effect a credit to Western for the amount Wyoming was holding but obligated to return. Petitioner therefore claims that Wyoming is entitled to a deduction in the year of restoration, 1964, for the amount restored to Western.

G.C.M. 16730, XV–I C.B. 179 (1936), approved the proposition that where income received under claim of right is properly reported in income for the years in which received and subsequently paid back as required, the taxpayer is entitled to a deduction for the amount of such payment for the year in which it was paid. See also *United States* v. *Lewis*, 340 U.S. 590 (1951), and *Healy* v. *Commissioner*, 345 U.S. 278 (1953).

In applying this proposition, the following criteria must be met. First, the taxpayer must receive funds under a claim of right which are taxable in the year of receipt. *Healy* v. *Commissioner, supra.* Second, the petitioner must show that the payee could have legally compelled the repayment. "The great weight of authority is that the payee must have at least the ability to legally compel the repayments before the repayments can be deducted by the payor." *Ernest H. Berger*, 37 T.C. 1026, 1032 (1962). Third, the taxpayer must establish that a deduction is allowable for the year of repayment. See *United States* v. *Simon*, 281 F.2d 520 ('C.A. 6, 1960) ; *United States* v. *Skelly Oil Co.*, 394 U.S. 678, 683 (1969) ; and, finally, that the repayment was actually made. *Maxwell* v. *United States*, 334 F.2d 181, 184 ('C.A. 5, 1964).[14] Wyoming succeeded in meeting the first criterion as

[14] *United States* v. *Skelly Oil Co.*, 394 U.S. 678, 683 (1969) ; *Maxwell* v. *United States*, 334 F. 2d 181, 184 (C.A. 5, 1964), and many cases cited herein deal with sec. 1341 and not directly with the claim-of-right doctrine. Nevertheless, the principles established in those cases are equally applicable to that doctrine. See *United States* v. *Skelly Oil Co., supra* at 682, wherein the Supreme Court in discussing the application of sec. 1341 stated :

"Nevertheless, it is clear that Congress did not intend to tamper with the underlying claim-of-right doctrine ; it only provided an alternative for certain cases in which the new approach favored the taxpayer. * * *"

a result of our holding that the advances were taxable in the year of receipt as income held under claim of right.

Respondent claims that none of the other criteria have been met. First, he contends that the ability of Western to "legally compel the repayment" of the advance rents and royalties is determined by the legal relationship created by the agreements between Wyoming and Western. Pointing out that under the contract Wyoming had the right to demand that Western use its best efforts to carry out the mining operation in order to reduce the outstanding unearned portion of the advance, the respondent asserts that Western did not have the ability to legally compel repayments until it had mined all the resources in the claims and then made a bona fide determination that it was not economically feasible to continue operations.

Second, respondent contends that even if Western could legally compel the repayment, the petitioner can show no grounds for a deduction.

Respondent argues that in the absence of a recognized loss there is no section of the Internal Revenue Code which would permit a deduction. A section 337 liquidation sale does not produce such a loss.

Finally, respondent contends that no actual repayment or restoration took place.

Our first concern is whether Western could legally compel the repayment of the unused advances.[15] Under the outstanding lease agreement, the unearned income was to be "worked off" as ore was mined and preconcentrated. Certainly, Western could not have discontinued operations and demanded a refund. However, there was no unilateral act by either party to discontinue the contract. What did take place was a mutual termination of the contract. Wyoming and Western both agreed that the lease contract would come to an end, unearned income would be returned, and a sale would take place. This agreement was predicated on the belief of both parties that Wyoming, pursuant to any claim made by Western, would not have been entitled to keep the unearned income. This belief was well founded, for money paid upon a contract which is subsequently rescinded is never forfeited unless there is an express or implied contract to that effect, and upon such rescission the money paid must be

---

[15] The exact nature of the necessary obligation has yet to be concretely defined by case law. The case of *United States* v. *Simon,* 281 F.2d 520 (C.A. 6, 1960), reviewed numerous cases in the area in order to point out that the word "obligation" as used in the claim-of-right doctrine has been interpreted both liberally and strictly by the courts. In a more recent opinion by this Court, the case of *Joseph P. Pike,* 44 T.C. 787, 799–800 (1965), involving sec. 1341 proffered the following interpretation:

"Certainly, a judicial determination of liability is not required. * * * However, we believe that it is necessary * * * for a taxpayer to demonstrate at least the probable validity of the adverse claim to the funds repaid. * * *"

returned to him who advanced it. See *Anderson* v. *Bell*, 70 Wyo. 471, 251 P.2d 572, 576–577 (1952). The express contract between Wyoming and Western specifically provided that money paid and unearned was to be returned. The return by Wyoming was not voluntary.

Respondent cites both *Crellin's Estate* v. *Commissioner*, 203 F. 2d 812 (C.A. 9, 1953), affirming 17 T.C. 781 (1951), and *Ernest H. Berger*, *supra*, for the proposition that when the force and effect of law does not compel the return of payments there is in reality a voluntary act which cannot create a deduction in any year. While this general proposition is correct, both of these cases are distinguishable on the facts. In both *Berger* and *Crellin's Estate* the Courts held that a repayment was voluntarily made when it was found that the party receiving the repayment could not have compelled a restoration of the sum under State law. In the present case, we can find no controlling Wyoming State law which would dictate a similar result.

Respondent next argues that the form of the repayment was a consideration offset within the section 337 liquidation sale. He asserts that the sale did not result in a loss, and therefore section 165 is not applicable. Respondent contends that no other provision in the Internal Revenue Code is available to permit a deduction for the alleged repayment. We feel respondent has overlooked the true nature of the repayment. The mode of repayment was a consideration adjustment within a section 337 sale, but the source of the repayment was the obligation arising from the premature termination of the lease contract.

The payment of this obligation arises in the ordinary course of the taxpayer's trade or business, and is properly deducted under section 162. It is no different than any refund which a lessor might be required to make for any number of business reasons. Cf. *Curran Realty Co.*, 15 T.C. 341 (1950).

The fact that the petitioner accomplished his payment by adjusting his consideration received does not defeat the validity of such a payment. Assume a situation in which a taxpayer holds for sale property subject to a mortgage. The seller may demand as payment the entire purchase price and apply the amount received in payment of the mortgage or he may adjust the actual consideration received in exchange for the purchaser's assuming the outstanding obligation. Regardless of which alternative is chosen, the seller's amount realized and the buyer's cost basis are the same. See *Crane* v. *Commissioner*, 331 U.S. 1 (1947), and *United States* v. *Hendler*, 303 U.S. 564 (1938). In the present case, Wyoming's amount realized and Western's cost basis reflect an actual sales price of $1,032,894.82. Of this $1,032,894.82, Wyoming received only $500,000 in actual consideration and it surely fol-

lows that the remainder of the amount realized and not received reflected Wyoming's repayment. The petitioner's reduction in actual consideration received is as much an out-of-pocket payment as if he had first received the full $1,032,894.82 and then repaid Western cash equal to the amount of its outstanding claim. It is just as much an out-of-pocket payment by the taxpayer as if he had used other available cash and on his own initiative refunded the unused amounts due the lessee. It is the substance of the economic relationship, not the form in which it is cast, that determines the incidence of Federal income tax. *Gregory* v. *Helvering*, 293 U.S. 465 (1935).

Respondent's final argument goes to the question of whether there was any actual repayment on the part of Wyoming. In *Maxwell* v. *United States, supra*, the taxpayer received $205,687.65 from the Maxwell Steel Co. under an alleged claim of right during the years 1950 to 1954. In 1953 he loaned the company $240,000, receiving a note in return. In 1959 the company made demand on Maxwell for restoration of the sum received by him during the years 1950 to 1954. The company subsequently accepted the cancellation of the balance due on his note in the amount of $197,666.83 in satisfaction of its claim for restoration. At the time of cancellation, the corporation was insolvent and the note was actually worthless.

The Court of Appeals found that Maxwell seeking relief under section 1341 could not prevail when, as in that case, the alleged restoration was ineffective and without significance because of the worthlessness of the alleged repayment.

Respondent's argument is similar to the rationale of *Maxwell*. The point he asserts is that the actual repayment was minimal. Wyoming and Western treated the liquidation as a sale of $1,032,894.82 in assets. However, the respondent calculates that Wyoming transferred assets worth much less than $1,032,894.82. Wyoming received $500,000 in cash on the sale and respondent claims that this cash payment was sufficient to purchase most of the assets transferred. Respondent claims there was only a minimal adjustment to the sales price in that the actual sales price should not have been much greater than the $500,-000 cash actually paid.

According to this line of thought, the February 28, 1962, mining deed between Western and Wyoming extended to Western the absolute and exclusive right to use the AEC quota assigned to the Skul-Spook claims. Respondent contends that Western in effect had use of the very asset which it later gained outright as a result of the sale. Respondent questions the validity of a transaction in which a buyer pays $784,000 for an asset which for all practical purposes he could utilize fully for $532,000. Furthermore, he claims that Wyoming never owned the

Grace and Star Lake properties and that the preconcentrator at the time of sale was worth no more than its salvage value.

Respondent's arguments on the value of the assets transferred are inconclusive. On brief he stated, "Respondent * * * does not suggest that the dealings between Robert Adams and the corporations of which he was president involve any impropriety." In light of the fact that Adams was a minority shareholder in Western, a corporation listed on the American Stock Exchange, audited by a national accounting firm, and presumably responsible to its shareholders, we must come to the same conclusion. Additionally, there is every indication that the sales price was bona fide and the values attributed to the various assets are justified.

Initially, we have found as a fact that the Grace ore payments and Star Lake properties were transferred to Wyoming and were included in the consideration in the sale to Western.

Second, the preconcentrator at the time of the sale was a valuable asset with a valuable remaining working life. It was worth much more than its salvage value. Petitioner has established that at the time of the sale a great deal of the Skul-Spook ore remained to be preconcentrated. Nothing indicates that the preconcentrator was unable to complete its job. Accordingly, we accept the $150,000 sales price allocated by Wyoming to the preconcentrator.

Finally, the value of the outright sale of Skul-Spook to Western must be established. It is our understanding that the consolidation agreement of April 1, 1962, permitted Western as lessee to include in its contract with the AEC the purchase allotment for the Skul-Spook claims. This agreement did not, however, permit Western to independently transfer the allotment to a third party. While it is true, after the sale Western continued to use Skul-Spook ore to fill the very same quota, the fact remains that by virtue of the sale Western became the owner, not the lessee, of the quota and was in a position to be more flexible regarding an outright transfer of such. We believe there is an additional value fostered by this change of circumstances. Uncontradicted testimony established the value of the quotas at $1.50–$2 per pound at the time of the sale. The quota, apart from the Skul-Spook mine, would therefore have a value in the neighborhood of $350,000. In addition, Skul-Spook was still a valuable property with large uranium reserves and as such commanded a considerable price. Consequently, we are left with the conclusion that the value of the consideration transferred by Wyoming was equal to that assigned to it by Western and Wyoming. Therefore, we hold that the actual restoration did in fact take place.

Respondent sought the following adjustments, which result in a diminishment of Wyoming's 1964 net operating loss: [16]

| | |
|---|---|
| Interest expense disallowed | $3,325.41 |
| Depreciation expense disallowed | 4,946.97 |
| Depletion disallowed | 145,239.26 |
| Restoration of depletion | 89,394.01 |
| Rental income (eliminated from return) | (68,725.20) |
| Royalty income (eliminated from return) | (91,634.47) |
| | |
| Total decrease in 1964 operating loss | 82,545.98 |

The petitioner has offered no evidence whatsoever to dispute respondent's disallowance of the interest and depreciation expenses. Consequently, as to these items, the presumption of correctness of the Commissioner's determination has not been overcome and he must prevail. See *Hoffman* v. *Commissioner*, 298 F.2d 784, 788 (C.A. 3, 1962), affirming a Memorandum Opinion of this Court with respect to this issue; Rule 32, Tax Court Rules of Practice; *Henry P. Wager*, 52 T.C. 416 (1969).

The elimination from income of the rental ($68,725.20) and royalty ($91,634.47) income is a proper adjustment for the year 1964. This adjustment stems from the holding that the advance rents and royalties were includable in income in the taxable year 1963. Petitioner originally carried these items in a deferred-income account and reported rent and royalty income only in the actual year of delivery of the goods and services. Since our holding requires inclusion at the time of receipt, prevention of a double inclusion as to these items can be accomplished only by eliminating them from petitioner's 1964 return. Concomitant with this is the disallowance of the depletion deduction ($145,239.26) which was taken in conjunction with the incorrect inclusion in 1964 of the above income items. Respondent in his deficiency notice correctly allowed the proper depletion deduction for the taxable year ended June 30, 1963. The time for taking the deduction for depletion by a lessor of mineral property is the taxable year for which he reports income from that property, and such deduction is allowable to the extent allocable to that income. See *National Oil & Gas Co.*, 6 B.T.A. 399 (1927). Thus, for example, a deduction for depletion is allowable in the year income is received from minimum royalties, even when there has been no production during the taxable year. See *Herring* v. *Commissioner*, 293 U.S. 322 (1934).[17] In order to prevent petitioner from receiving a depletion allowance in the years 1963 and 1964 on the same reserves, it is proper to eliminate the depletion deduction for the year 1964.

---

[16] All of the requested adjustments are proper.
[17] See also Rev. Rul. 68–565, 1968–2 C.B. 263.

The final item of adjustment, apparently conceded by petitioner, is the restoration of depletion ($89,394.01). As has been previously determined, Wyoming received advance royalties includable in income for the taxable year ended June 30, 1963. By reason of this inclusion, respondent allowed Wyoming cost depletion on the royalties received to the full extent of the estimated reserves. In September 1963, Wyoming sold its assets to Western and by virtue of this sale Wyoming's ownership of Skul-Spook terminated before Western extracted all of the previously paid-for ore. Respondent in his adjustment restored to income in the taxable year of the sale, 1964, the depletion deductions allowed with respect to the units of U308 which were not extracted by reason of the sale. This adjustment, the restoration of the depletion deduction to income, correctly prevents the allowance of a double deduction for depletion with respect to the production of the same mineral. It is well settled that Western, by virtue of its new ownership of the economic interest in Skul-Spook, is entitled to the right of a depletion allowance in the remaining ore. See *Anderson* v. *Helvering*, 310 U.S. 404 (1940), and *Burton-Sutton Oil Co.* v. *Commissioner*, 328 U.S. 25 (1946). In order to prevent a double allowance, the party who terminates his right to extract minerals before all such minerals have been extracted, must adjust his capital account by restoring the depletion deductions made in prior years on account of any units paid for in advance but not extracted. A corresponding amount must be returned as income for the year of termination.[18]

Petitioner does not dispute respondent's assumption that Wyoming by the sale effectively terminated its right to extract any further minerals from Skul-Spook. Accordingly, the depletion deduction is properly restored to income in the year of this termination.

Finally, the uncontradicted evidence establishes and respondent concedes that the salvage value of the preconcentrator for the taxable years ended June 30, 1962, 1963, and 1964, would equal $50,000.

Petitioner by his failure to bring forth any evidence has conceded respondent's determination that Wyoming should have reflected a salvage value of 5 percent for the equipment used in connection with the operation of its business.

Petitioner by his failure to bring forth any evidence has conceded respondent's adjustment which redetermined and increased petitioner's

---

[18] Sec. 1.612-3(b)(2), Income Tax Regs., provides:

(2) If the right to extract minerals * * * against which the advanced royalties may be applied expires, terminates, or is abandoned before all such minerals * * * have been extracted * * *, the payee shall adjust his capital account by restoring thereto the depletion deductions made in prior years on account of any units of mineral * * * paid for in advance but not extracted * * *, and a corresponding amount must be returned as income for the year of such expiration, termination, or abandonment. * * *

See also *Douglas* v. *Commissioner*, 322 U.S. 275 (1944).

reserves for the years 1963 and 1964 to reflect petitioner's failure to take into consideration reserves in place which, when produced, resulted in 30,519 pounds of U308.

*Decisions will be entered under Rule 50.*